# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| WILLIAM CUNNINGHAM and TRI-STATE COLLISION, LLC, individually and on behalf of all others similarly situated; | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| FORD MOTOR COMPANY; | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs William Cunningham and Tri-State Collision, LLC ("Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide and statewide classes they seek to represent (collectively, the "Class"), hereby alleges against Ford Motor Company ("Defendant" or "Ford"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon investigation of counsel, as follows:

## INTRODUCTION

1.    Plaintiffs bring this case, seeking damages and equitable relief, individually and on behalf of the other Class members, each of whom purchased or leased one or more model year 2017-2021 Ford F-250, F-350, and F-450 Super Duty vehicles equipped with an electronic tailgate latch release switch (the "Class Vehicles").  The Class Vehicles are Ford's "Super Duty" pickup trucks that are marketed and used for hauling and towing heavy cargo and equipment.

2.    Under normal operation, tailgate latches retract only after the operator engages the tailgate latch release switch.  This act opens the tailgate. In the Class Vehicles, the tailgate latch release is electronic and can be activated by depressing a button on the key fob, in the cab of the truck above the emergency brake release switch, or on the tailgate itself.

3.      The tailgate system in the Class Vehicles, however, is defective because the tailgates unintentionally open, including while the vehicle is in motion ("Tailgate Defect").

4.      The Tailgate Defect could be caused by water entering the wiring harness and shorting the circuit, as Ford admits, or it could be caused by wiring system design or manufacturing flaws, a tailgate latch that fails to hold sufficient tension, or a tailgate system that is not adequately robust to withstand common operating conditions.

5.      As explained below, Ford denies Class members free warranty repairs for the Tailgate Defect, stating that the tailgate opened because the consumer accidentally depressed an activation button.

6.      The Tailgate Defect presents a serious risk of harm to occupants and others sharing the road.  First, the Tailgate Defect can result in loss of unrestrained cargo, increasing the risk of injury or crash.  Second, the Tailgate Defect can cause the tailgate to release and contact towed trailers, damaging both the tailgate and trailer.  Third, the Tailgate Defect can reduce the clearance between the Class Vehicle and a towed trailer, limiting the vehicle's range of mobility and increasing the risk of injury or crash.  Class Vehicles do not provide any warning sounds or have any other method of alerting drivers when there is an unintentional opening of the tailgate.  The electronic tailgate system is not disabled when the vehicle is gear.

3

7.     The Tailgate Defect results in unintended tailgate activation and is present in Class Vehicles from the date of manufacture and is thus covered by Ford's 3 year/36,000 miles "Bumper to Bumper" warranty.

8.     On October 16, 2017, after having received reports of sudden and unintended tailgate openings in the Class Vehicles, Ford issued a Technical Service Bulletin ("TSB") acknowledging that some model year 2017 Class Vehicles "may experience intermittent electrical concerns due to water intrusion into the 14405 wire harness. ***Symptoms may include, . . . uncommanded tailgate opening*** . . . ." (Emphasis added.) Ford's proposed TSB remedy directs Ford's repair technicians to "[r]eplace the 14405 wire harness."[1]

9.     On October 12, 2018, the National Highway Traffic Safety Administration ("NHTSA") opened PE18-011, a pre-recall evaluation, to investigate allegations of unintended tailgate openings in 2017 Ford F-250, F-350, and F-450 vehicles.[2]

10.    Following PE18-011, at NHTSA's suggestion, on December 4, 2019, Ford initiated Recall 19V-864 (the "Recall") recalling 231,664 2017-2019 Ford F-

---

[1] Ford's October 16, 2017 TSB is attached hereto as Exhibit A.  A Technical Service Bulletin or TSB is a document issued by Ford to its technicians explaining diagnosis and repair procedures for known vehicle issues.

[2] NHTSA's PE18-011 Opening Resume is attached hereto as Exhibit B.

250, F-350, and F-450 vehicles equipped with an electronic tailgate latch release switch due to the Tailgate Defect.[3]  Ford stated:

> water entering the electrical wiring system may cause a short circuit resulting in the unintended switch activation and release of the tailgate latches. This could cause unintended opening of the tailgate either when the vehicle is not moving or is in motion.

11.    Specifically, Ford stated that "inspection of the complaint vehicle parts found evidence of water in various electrical components, including wiring harness connectors, eyelets, splices or the tailgate switch."[4]

12.    Ford also acknowledged the Tailgate Defect is a serious safety defect that increases the risk of crash.[5]

13.    Ford identified a purported remedy to cure the Tailgate Defect:

> Dealers will modify the tailgate/frame wiring harnesses by adding jumper pigtails to isolate the tailgate release control circuits, and will install a new tailgate handle release switch.
>
> ***
>
> The additional wiring harness jumper isolates power and ground circuits in separate connectors to prevent short circuiting of the release switch. The new tailgate handle release switch (p/n GB5T-14K147-CA) also has been

---

[3] Ford's December 4, 2019 Part 573 Safety Recall Report is attached hereto as Exhibit C.

[4] The Chronology for Ford's Recall is attached hereto as Exhibit D.

[5] Exhibit C.

updated to further prevent water entry into the switch and electrical system.

14.     Ford's Recall and the purported Recall remedy is inadequate on multiple fronts.   First, as set forth below, Class members continue to lodge complaints of unintentional tailgate openings even after receiving the Recall repair.

15.     Indeed, on January 15, 2021, more than a year after the Recall, NHTSA opened Recall Query RQ21-001 "to further assess the scope, frequency, and safety consequences of the alleged defect in the remedy provided by [the Recall]."[6] NHTSA launched RQ21-001 after receiving reports of Class members experiencing the Tailgate Defect after receiving the Recall repair, a representative sampling of which is set forth herein.

16.     Second, Ford's Recall excludes model year 2020-2021 Class Vehicles. Ford stated that model year 2020 Class Vehicles are not affected because, "[a]n updated tailgate release switch and wiring harness jumper were incorporated into production effective with the 2020 model year on November 4, 2019."[7]

17.     Despite purportedly being manufactured with "updated" parts, as detailed below, owners and lessees of model year 2020 Class Vehicles continue to submit complaints of Tailgate Defect symptoms to NHTSA.

---

[6] NHTSA's RQ21-001 Opening Resume is attached hereto as Exhibit E.

[7] Exhibit C.

18.     Third, Ford's Recall is inadequate because Ford failed to adequately notify Class members of the Recall.  As Plaintiff Tri-State Collision alleges below, Ford did not notify Plaintiff that its vehicle was entitled to receive the Recall repair.

19.     Fourth, Ford's Recall fails to reimburse consumers for out-of-pocket costs and expenses resulting from the Tailgate Defect, such as the cost of repairs which can cost hundreds to thousands of dollars.

20.     Consumers who experience the Tailgate Defect outside of the warranty period and in Class Vehicles not subject to the Recall must pay for repairs out-of-pocket.

21.     The Tailgate Defect jeopardizes Plaintiffs' and the other Class members' safe operation of their Class Vehicles, exposing them and other drivers on the road to the risk of serious injury and even death.  As shown below, the NHTSA website is replete with examples of near accidents caused by unintentional tailgate openings while Class Vehicles are on the road, including one instance of a Class Vehicle losing its payload, which caused a "portable generator and cables [to] fall in front of several cars … temporarily shutting down both lanes" of the road. *See* ¶ [153], *infra*.

22.     A tailgate that unintentionally opens renders the Class Vehicles unfit for their ordinary purpose of reliably and safely transporting humans and animals and hauling and towing heavy cargo and equipment.

23.     Despite its awareness of the Tailgate Defect and its duty to disclose it, Ford continued to sell Class Vehicles and market them as safe, dependable, and capable of carrying, towing and hauling heavy cargo and equipment.  Ford did so despite knowing that the Class Vehicles contained a dangerously defective and unreliable tailgate latch system.

24.     Plaintiffs and the other Class members purchased their Class Vehicles believing they were safe and dependable vehicles, capable of safely carrying pickup bed payloads and towing and hauling heavy cargo and equipment.  The Tailgate Defect renders the Class Vehicles less safe and less valuable than consumers would reasonably expect, and less safe and less valuable than the Class Vehicles would be if Ford did not design, manufacture and sell or lease the Class Vehicles with the Tailgate Defect.  As a result of Ford's misconduct, Plaintiffs and the other Class members were harmed.

25.     Plaintiffs thus bring this class action, on behalf of themselves and all similarly-situated Class members, seeking all relief to which it and the other Class members are entitled in law and equity, including but not limited to the recovery of the purchase price of their vehicles, damages including for overpayment and diminution in the value of the Class Vehicles, unreimbursed out of pocket costs and expenses, and an injunction compelling Ford to replace or recall and adequately repair all Class Vehicles.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and (d) because Plaintiffs are citizens of a different state than Defendant, there are more than 100 Class members nationwide, and the amount in controversy for the Class exceeds $5,000,000, exclusive of costs and interest.

27.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

28.     This Court has personal jurisdiction over Ford because Ford maintains its principal place of business in the State of Michigan and in this District.  Moreover, Ford is authorized to do business in this District and conducts substantial business in this District.

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Ford resides in this District.  Additionally, Ford has marketed, advertised, sold, and leased Class Vehicles within this District.

## PARTIES

### Plaintiff

### A.     Alabama

30.     Plaintiff Tri State Collision, LLC, is a limited liability company registered to business in the State of Alabama and maintains its principal place of business in Alabama.

31.     Plaintiff Tri State Collision, LLC, purchased a new 2018 Ford F-250 from Money Ford in Abbeville, Alabama, in March of 2018.  Plaintiff's vehicle is a Class Vehicle equipped with a defective tailgate system.

32.     Prior to purchase, Plaintiff Tri State Collision, LLC, reviewed Ford's promotional materials, such as Ford's advertisements, Ford's website, the Monroney sticker, and interacted with at least one sales representative without Ford disclosing the Tailgate Defect.

33.     Through its exposure to Ford's advertisements, promotional materials and Ford's other public statements, Plaintiff Tri State Collision, LLC, became aware of Ford's uniform and pervasive marketing message that its vehicles are safe and reliable trucks for towing and hauling heavy cargo and equipment, which was material to its decision to purchase its Class Vehicle.  When it purchased the vehicle, it believed, based on Ford's uniform and pervasive marketing message, that it would be in a safe and dependable condition.  At no point before Plaintiff Tri State Collision, LLC, purchased its vehicle did Ford disclose to it that its vehicle was not safe or dependable, or that it was equipped with a defective tailgate system.

34.     Plaintiff Tri State Collision, LLC's Ford suffers from the Tailgate Defect because the tailgate was defective the moment it was manufactured and assembled.  Plaintiff first experienced the symptoms associated with the Tailgate Defect approximately two months after the purchase of its Class Vehicle at

approximately 3,500 miles.  Plaintiff's Class Vehicle's tailgate continues to open unintentionally, at least once approximately every other week.

35.    The Tailgate Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Tri State Collision, LLC, other occupants in its Class Vehicle, and others on the road. At no time did Ford inform Plaintiff Tri State Collision, LLC, of the seriousness of the Tailgate Defect or recommend that it discontinue use of its vehicle until there is a repair or a replacement tailgate system.

36.    Plaintiff Tri State Collision, LLC, purchased its Class Vehicle with the Tailgate Defect as part of a transaction in which Ford did not disclose material facts related to the automobile's essential purpose.  Plaintiff Tri State Collision, LLC, did not receive the benefit of its bargain.  Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and it did not receive a vehicle that met ordinary and reasonable consumer expectations.  The Tailgate Defect has significantly diminished the value of Plaintiffs Tri State Collision, LLC's Class Vehicle.

37.    Plaintiff Tri State Collision, LLC, has not received any notice of the Recall.  Ford has not offered a replacement tailgate system or an extended warranty for the part.

38.    Had Ford disclosed the Tailgate Defect, Plaintiff Tri State Collision, LLC, would not have purchased its Class Vehicle, or would have paid less to do so.

39.    Plaintiff Tri State Collision, LLC, would purchase another Ford vehicle in the future if Ford's representations about the vehicle, including its safety and durability, were accurate.

**B.    Georgia**

40.     Plaintiff William Cunningham is a citizen of the State of Georgia and resides in Warm Spring, Georgia.

41.    Plaintiff Cunningham purchased a new 2019 Ford F-250 from Fitzgerald Ford in Fitzgerald, Georgia on November 6, 2019. Plaintiff's vehicle is a Recalled Vehicle equipped with a defective tailgate system.

42.    Prior to purchase, Plaintiff Cunningham reviewed Ford's promotional materials, such as Ford's website and interacted with at least one sales representative without Ford disclosing the Tailgate Defect.

43.    Through its exposure to Ford's advertisements, promotional materials and Ford's other public statements, Plaintiff Cunningham became aware of Ford's uniform and pervasive marketing message that its vehicles are safe and reliable trucks for towing and hauling heavy cargo and equipment, which was material to its decision to purchase its Class Vehicle.  When it purchased the vehicle, it believed, based on Ford's uniform and pervasive marketing message, that it would be in a safe

and dependable condition.  At no point before Plaintiff Cunningham purchased his vehicle did Ford disclose to him that his vehicle was not safe or dependable, or that it was equipped with a defective tailgate system.

44.    Plaintiff Cunningham's Ford suffers from the Tailgate Defect because the tailgate was defective the moment it was manufactured and assembled.  Plaintiff Cunningham first experienced the symptoms associated with the Tailgate Defect soon after purchase of his Class Vehicle at approximately 5,000 miles. Plaintiff's Class Vehicle's tailgate continues to open unintentionally.

45.    The Tailgate Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Cunningham, other occupants in his Class Vehicle, and others on the road.  At no time did Ford inform Plaintiff Cunningham of the seriousness of the Tailgate Defect or recommend that he discontinue use of his vehicle until there is a repair or a replacement tailgate system.

46.    Plaintiff Cunningham purchased his Class Vehicle with the Tailgate Defect as part of a transaction in which Ford did not disclose material facts related to the automobile's essential purpose.  Plaintiff Cunningham did not receive the benefit of his bargain.  Plaintiff purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and

reasonable consumer expectations.  The Tailgate Defect has significantly diminished the value of Plaintiff's Class Vehicle.

47.     Had Ford disclosed the Tailgate Defect, Plaintiff Cunningham would not have purchased his Class Vehicle, or would have paid less to do so.

48.     Plaintiff Cunningham would purchase another Ford vehicle in the future if Ford's representations about the vehicle, including its safety and durability, were accurate.

**Defendant**

49.     Defendant Ford Motor Company is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan.  Ford is a citizen of the States of Delaware and Michigan.

50.     At all times relevant herein, Defendant Ford engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, and leasing automobiles, including the Class Vehicles, throughout the United States.

**FACTUAL ALLEGATIONS**

51.     The tailgates in the Class Vehicles are predisposed to opening unintentionally and under normal-use conditions that would not cause non-defective tailgates to open without operator intent.  The Tailgate Defect not only compromises the safety, comfort and enjoyment of Class Vehicle occupants, including Plaintiffs and Class members, but it also jeopardizes the safety of others on the road.

14

Moreover, Ford's remedy fails to adequately repair the Tailgate Defect, leaving "repaired" tailgates substantially likely to incur repeated failures.

52.     Upon information and belief, all Class Vehicles have substantially similar tailgates and experience substantially similar failure modes.   Thus, the Tailgate Defect is a uniform defect that exists throughout all Class Vehicles.

A.     **Tailgate Operation and The Tailgate Defect**

53.     The tailgate release switch (*i.e.*, handle) disengages the tailgate's latches, allowing the tailgate to open.

54.     As the illustration below demonstrates, a tailgate latch system consists of two latches positioned on each side of the tailgate.   Metal rods connect to each latch and link them to the release switch.



55.     Manual operation of the tailgate involves a pull handle, that, when engaged, pulls the two connecting rods inward, disengaging the latches on each side of the tailgate, permitting tailgate open by a combination of human hand and gravity.

56.   However, rather than employing a traditional manual release switch, the Class Vehicles' tailgate system uses an electronic release switch that allows unintentional openings.   The electronic tailgate system can be activated by depressing a button either on the key fob, in the cab of the truck above the emergency brake release switch, or on the tailgate itself.

57.   The electronic tailgate system is defective, however, because the tailgates unintentionally open during normal operation.

58.   Water can enter the wiring harness and short the powered latch circuit, as Ford admits.  However, wiring system design or manufacturing flaws can invite unintended latch circuit closure and associated tailgate opening.

59.   Separately, the tailgate latch may not maintain tension sufficient to hold the tailgate in the upright closed position.

60.   Finally, the tailgate system is not adequately robust to withstand common operating conditions such as moisture, heat, vibration, and unintended friction contact with nearby components.

61.   The obvious goal in designing a tailgate is to create one that operates safely and when intended, including mechanisms to keep the tailgate from unintentionally opening while the vehicle is in operation.  If the tailgate fails in that goal, its overall design has failed.

62.   Ford knew or should have known that a defectively designed tailgate could suffer sudden and unintentional opening under normal use and conditions.

63.   The symptoms of Tailgate Defect frequently present at low mileages, within the warranty period.

64.   Plaintiffs and the other Class members purchased or leased their Class Vehicles for the purpose of safely providing transportation and hauling heavy cargo and equipment.

65.   A vehicle that lacks a reliably operational tailgate puts its driver and passenger at an ever-present risk of suffering serious bodily injury, including death. Moreover, as the customer complaints below make clear, the Tailgate Defect places others on the road at a substantially increased and ever-present risk to suffer serious bodily injury, including death.  The Tailgate Defect can also result in property damage, including injury to towed trailers and other nearby vehicles.

66.   A vehicle without a safe, reliable, and operational tailgate is unfit for its ordinary and intended purpose.  This is particularly true for Class Vehicles, which are marketed and sold for the purpose of hauling and towing heavy cargo and equipment.

67.   Unintentional tailgate operation can damage the tailgate and trailer, reduce vehicle operability, and release unrestrained cargo into traffic.

17

68.     Because Ford manufactured the Class Vehicles without a safe, reliable, and operational tailgate, the Tailgate Defect renders the Class Vehicles unfit for their ordinary and intended purpose.

69.     As a result of the Tailgate Defect, owners or lessors of Class Vehicles must either cease driving their trucks—including for hauling heavy cargo and equipment, the very purpose for which consumers purchase these Super Duty trucks—or risk an unintentional tailgate open which can lead to serious injury and/or property damage.

70.     The Tailgate Defect substantially impairs the use, value, and safety of the Class Vehicles and renders the Class Vehicles substantially less drivable, less safe, and less useful.

71.     Due to the Tailgate defect, all Class Vehicles are unmerchantable, unfit for the purpose of providing safe transportation and hauling, and are substantially less drivable, less safe, and less useful.

72.     Ford's inability to adequately remedy the Tailgate Defect leaves the tailgates vulnerable to repeat failure.

73.     Separately, Ford routinely denies Class members' in-warranty Tailgate Defect repairs, citing operator error.  Specifically, Ford claims that Class members command electronic tailgate release by storing key fobs in clothing pockets.  This is

a flawed and baseless assumption, because, among other things, the key fob tailgate release requires rapid succession button activation.

74.     Indeed, Ford's attempt to deflect attention away from its responsibility for the Tailgate Defect is belied by Ford's October 2017 TSB and 2019 Recall, both of which identify water intrusion as the cause of unintended tailgate openings. Separately, many NHTSA complaints note accidental tailgate openings despite key fobs resting in locations not subject to accidental button activation.

75.     Despite Ford's blame shifting, it is reasonably foreseeable that Class members would carry key fobs in clothing pockets.  That Class Vehicles are equipped with keyless ignition makes this more likely.  If key fobs are overly sensitive to pocket activation, they may serve to aggravate the Tailgate Defect.  Yet, despite putting forward fob activation as a culprit, Ford has not provided Class members with an improved key fob unit that, for example, is not susceptible unintentional button activation or offered to disable electronic the tailgate release while the vehicle is in gear.

76.     When Ford refuses to cover the cost to repair the Tailgate Defect, consumers pay hundreds to thousands of dollars for the same defective Ford parts, inviting repeat failure.

77.    Ford violated its duty to disclose the Tailgate Defect.  Had Ford disclosed the Tailgate Defect, Plaintiffs and other Class members would not have purchased or leased their vehicles or would have paid less for them.

**B.    The Tailgate Defect Creates A Safety Risk to Drivers and Others On The Road**

78.    The Tailgate Defect poses a risk to the safety of Plaintiffs, the other Class members, and others on the road.

79.    The Tailgate Defect increases the risk of injury or death to Class Vehicle drivers and occupants.  Ford markets the Class Vehicles as "Super Duty" trucks whose intended use includes, among other things, towing trailers.  However, unintended tailgate opening frequently results in Class Vehicles making contact with the trailer, damaging both the tailgate and trailer and/or the trailer's attachments. Unintended opening reduces truck to trailer clearance, limiting the Class vehicle's turning radius.

80.    For example, on November 26, 2018, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA, stating that his tailgate unintentionally opened and impacted propane tanks mounted to an Airstream Trailer:

> AUTOMATIC ELECTRIC TAIL GATE OPENS RANDOMLY WITHOUT DRIVER SELECTION. THIS HAS HAPPENED SEVERAL TIMES WHILE VEHICLE IS MOVING AND HAS CAUSED DAMAGE TO TAILGATE AND TRAVEL TRAILER. NO INDICATION TAILGATE IS OPEN GIVEN TO DRIVER. THIS HAPPENED WITHIN THE FIRST 100

MILES AFTER PURCHASE, THE FIRST TIME. IT HAPPENED SEVERAL TIMES AFTER THAT. LAST INCIDENT I HAD JUST PULLED ONTO THE FREEWAY AND WAS FLAGGED DOWN BY A PASSING TRUCKER WHILE I WAS DRIVING AT 65MPH THAT MY TAILGATE HAD OPENED. IMAGINE IF SOMETHING HAD FALLEN OUT OF THE BED OF MY TRUCK AND CAUSED ANOTHER MOTORIST TO CRASH. ***I HAD HEARD A CREAKING SOUND WHILE TURNING ONTO A ROADWAY WITH MY AIRSTREAM TRAVEL TRAILER ATTACHED. THE TAILGATE HAD CRUNCHED AGAINST THE PROPANE BOTTLES CAUSING DAMAGE TO THE TAILGATE, THE PROPANE BOTTLES, AND THE COVER.*** THIS HAD HAPPENED TO ME SEVERAL TIMES IN OTHER INSTANCES BUT THOUGHT IT WAS A FLUKE UNTIL THIS LAST EVENT WHILE TOWING MY AIRSTREAM TRAVEL TRAILER. I CONTACTED FORD DEALER WHERE I PURCHASED IN AUSTIN; THEY SUBMITTED TO FORD AND FORD SAID THEY WOULD PAY PART OF THE BILL, BUT I AM ON THE HOOK TO PAY ALSO. THIS IS A FORD WIRING HARNESS ISSUE. SEVERAL OTHER PEOPLE HAVE REPORTED SAME ISSUE. FORD SHOULD FIX THIS 100% BEFORE SOMETHING SERIOUS ACCIDENT OCCURS FROM ITEMS FALLING OUT OF THE BACK OF THE TRUCK WHEN BED OPENS AUTOMATICALLY.[8]

81.     On April 3, 2018, the owner of 2017 Ford F-250 filed the following complaint with NHTSA, stating that the tailgate unintentionally opened and reduced the clearance between the truck and trailer when turning, reducing turning radius:

APRIL 2, 2018. I OWN A FORD F250 SUPER DUTY PLATINUM WITH 4753 MILES ON IT, PURCHASED

---

[8] NHTSA ID 11153959 (emphasis added).

NOV 2017. THIS WEEK WAS THE 1ST TIME I TOWED MY TRAVEL TRAILER (GVW 7800LB) AND ON THREE (3) DIFFERENT OCCASIONS THE TAIL POPPED OPEN BY IT SELF. ALL THREE OCCASIONS I WAS TURNING AT SLOW SPEEDS AND WAS TRAVELING ON FLAT PAVEMENT. THE RESULT OF THE UNINTENTIONAL OPENINGS WAS DAMAGE TO THE TAILGATE WHEN THE TAILGATE HIT THE TRAILER STANCHION WHILE TURNING.[9]

82.     The Tailgate Defect also jeopardizes the safety of other drivers on the road.  As Ford admitted in its Recall, the Tailgate Defect "may result in the loss of unrestrained cargo, increasing the risk of crash."  For example, on July 19, 2019, the owner of a 2017 Ford F-350 filed the complaint with NHTSA, stating how his tailgate unintentionally opened and he lost cargo on the highway:

TRUCK TAILGATE RANDOMLY OPENS WHEN VEHICLE IS BEING DRIVEN. I HAVE OWNED THIS TRUCK FOR 6 MONTHS AND THE RANDOM OPENING HAS OCCURED 4 TIMES WHEN DRIVING. WITHOUT ANY NOTICE OR WARNING THE TRUCK TAILGATE OPENS WHEN THE VEHICLE IS BEING DRIVEN. ***THE MOST RECENT OCCURRENCE CAUSED THE LOSS OF CARGO ON THE HIGHWAY.*** IT APPEARS THE FOB IS SOMEHOW DOUBLE CLICKED WHEN IN THE DRIVER'S POCKET CAUSING THE TAILGATE TO OPEN (FOB HAS TAILGATE REMOTE OPENING FEATURE). THIS IS A SERIOUS SAFETY CONCERN SINCE THE VEHICLE OPERATOR HAS NO WAY OF KNOWING THE TAILGATE HAS OPENED. THERE SHOULD BE AN INTERLOCK THAT PREVENTS THE AUTOMATIC OPENING OF

---

[9] NHTSA ID 11082643.

THE TAILGATE WHEN THE VEHICLE IS BEING DRIVEN.[10]

83.    On May 22, 2019, another owner of 2017 Ford F-250 filed a similar complaint:

> THE TAILGATE IS ELECTRONIC AND IS OPENING ON IT'S OWN WHILE IN MOTION. WITH MY 5TH WHEEL RV CONNECTED I CANNOT TELL WHEN THE TAILGATE OPENS AND THIS TIME IT DAMAGED BOTH THE TAILGATE AND MY RV WHEN I MADE A RIGHT TURN. ***I ALSO LOST CARGO THAT WAS IN THE BED***.[11]

84.    On August 13, 2019, the owner of a 2017 Ford F-250 complained to NHTSA that a loaded toolbox fell out of his truck and onto a public road:

> TAILGATE OPENS WHILE DRIVING DOWN THE ROAD, FORD DID NOT RESPOND WHEN I FIRST IDENTIFIED THIS PROBLEM, THEN ***I LOST AN EXPENSIVE TOOL BOX FULL OF TOOLS FROM THE BACK OF MY TRUCK, STILL NO RESOLUTION AND I'M OUT THOUSANDS OF DOLLARS.*** FORD DOES NOT CARE AFTER THE SALE.[12]

85.    These complaints are just examples of the voluminous complaints submitted to NHTSA and other online sources exemplifying the serious safety risks created by the Tailgate Defect.

---

[10] NHTSA ID 11233349 (emphasis added).

[11] NHTSA ID 11209199 (emphasis added).

[12] NHTSA ID 11243493 (emphasis added).

C.   **Ford Knew of the Tailgate Defect Prior to Sale or Lease of Class Vehicles**

86.   Ford knew or should have known of the Tailgate Defect since at least 2016, well before Plaintiffs and the other Class members purchased or leased their Class Vehicles.  Pre-release evaluation and testing data; repair and replacement part sales data; consumer complaints made directly to Ford, NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; and aggregate data from authorized dealers put Ford on notice of the Tailgate Defect.

i.   **Ford's Knowledge Gained From Pre-Release Design, Manufacture, Engineering, and Testing Data**

87.   Pre-release design, engineering, manufacture, and testing of Class Vehicles provided Ford with comprehensive and exclusive knowledge about the tailgate latch system, particularly the system's functions, uses and the expected conditions it may face.

88.   Ford knew that electrical components of the tailgate, including the wiring harness connectors, eyelets, splices, or the tailgate switch, would fail when exposed to water.

89.   Ford knew or should have known that its design and manufacture of the tailgate system, including all subsystems and components, made the Class Vehicles' tailgate prone to opening unintentionally.

24

90.    An adequate pre-release analysis of the design, engineering, and manufacturing of the tailgate system would have revealed its vulnerability.

91.    Ford performed such analysis (*see* Section E, *infra*), but the results and findings are unavailable to Plaintiffs without discovery.

### ii.    Ford's Knowledge Gained From Repair and Warranty Data

92.    Ford also knew or should have known about the Tailgate Defect because of the large number of claims for tailgate repairs and part replacements made during the Class Vehicles' warranty periods.

93.    Consumers complain that the Tailgate Defect often causes tailgate failures at low mileages, within the warranty period.

94.    Ford collects, reviews, and analyzes detailed information about repairs made on vehicles in warranty at its dealerships and service centers, including the type and frequency of such repairs.  Complete data on such repairs is exclusively within Ford's control and unavailable to Plaintiff without discovery.

95.    Moreover, Ford also knew or should have known about the Tailgate Defect because of the higher than expected number of replacement tailgate parts its authorized dealerships ordered from Ford, which would have alerted Ford to the proliferation of the Tailgate Defect.

96.    Ford service centers use Ford replacement parts that they order directly from Ford. Upon information and belief, independent repair shops and consumers

doing repairs themselves also purchase replacement parts directly from Ford.  Ford possesses data regarding the number and frequency of replacement part orders.

97.    Plaintiffs, however, do not have access to this data without discovery.

### iii.    Ford's Knowledge Communicated to Ford Technicians Through TSB 17-2196

98.    On October 16, 2017, Ford issued TSB 17-2196 because "[s]ome 2017 F-Super Duty pickup vehicles . . . may exhibits intermittent electrical concerns due to water intrusion into the 14405 wire harness. Symptoms may include . . . uncommanded tailgate opening . . . ."[13]

99.    To remedy the defect, Ford instructed technicians to "[r]eplace the 14405 wire harness."[14]

100.    Therefore, as of October 16, 2017, Ford acknowledged internally to its technicians that the Tailgate Defect exists.  Ford did not reveal what it knew to the consuming public, however.

101.    TSBs are not formulated and published overnight.  Manufacturers, like Ford, undertake a strategic root cause analysis to develop the diagnostic and repair procedures that are promulgated through TSBs.  Moreover, TSBs necessarily undergo an editing and review process before they are issued.  Ford's knowledge of

---

[13] Exhibit A.

[14] *Id*.

the Tailgate Defect, therefore, reasonably predates October 16, 2017.  The exact date, however, is unavailable to Plaintiffs without discovery.

### iv. Ford's Knowledge Gained Through Voluminous NHTSA Complaints

102.  Beginning with model year 2017 Class Vehicles, online resources reveal a spike in complaints submitted to NHTSA regarding the Tailgate Defect.

103.  Pursuant to the TREAD Act, 49 U.S.C. § 30118, Ford monitors customer complaints submitted to NHTSA.

104.  By monitoring the NHTSA database, Ford learned, or should have learned, that Class members complained of the Tailgate Defect well within the warranty period.  The NHTSA database complaints informed Ford of the Tailgate Defect's safety consequences.  For example, on December 12, 2020, the owner of a 2019 Ford F-250 filed the following complaint with NHTSA:

> TRUCK'S TAILGATE OPENS     AUTOMATICALLY AND WITHOUT WARNING. VEHICLE WAS IN MOTION BUT UNSURE WHAT SPEED AS NO INDICATION THAT TAILGATE IS OPEN. THIS HAS HAPPENED TWICE BEFORE.[15]

105.  On December 8, 2019, the owner of a 2019 Ford F-250 filed the following complaint with NHTSA:

> TAILGATE OPENS   UNEXPECTITALY.  HAPPENS AT REST AND WHILE MOVING.  DON'T KNOW IT

---

[15] NHTSA ID 11383167.

HAS HAPPENED UNTIL EXITING THE VEHICLE OR
PUTTING IN REVERSE.[16]

106.   On November 30, 2019, the owner of a 2019 Ford F-250 filed the

following complaint with NHTSA:

> ELECTRONIC TAILGATE OPENS UP ON ITS OWN
> WHILE DRIVING DOWN THE HIGHWAY OR WHILE
> PARKED. ***I NEARLY LOST MY CARGO DUE TO
> THIS WHICH WOULD HAVE CAUSED AN
> ACCIDENT. ALSO, I INJURED MY HAND WHEN
> THE TAILGATE OPENED ON ITS OWN AND WAS
> PINCHED BETWEEN THE TAIL GATE AND
> TRAILER JACK.*** NOTHING BONES WERE
> FRACTURED BUT WAS REALLY SORE AND HAD
> BRUISING AND LACERATION. I FOUND ONLINE
> HOW THIS WAS PREVIOUSLY INVESTIGATED IN
> THE 2017 FORD SUPER DUTY BUT NO RECALL
> WAS ISSUED. I HAVE A 2019 SUPERDUTY AND
> WAS INJURED AND NEARLY CAUSED AN
> ACCIDENT ON DIFFERENT OCCASIONS. ***I HAVE
> HAD THE TAILGATE OPEN ON ITS OWN 12 TIMES
> NOW AND IT IS GETTING WORSE.*** I HAVE NOT
> FOUND ANY SPECIFIC ACTION/CONFIGURATION
> THAT TRIGGERS THIS. IT IS TOTALLY RANDOM.
> PLEASE HELP[17]

107.   November 18, 2019, the owner of 2017 Ford F-250 filed the following

complaint with NHTSA:

> IN 2017 I PURCHASED A NEW F-250 SUPER DUTY
> PICK-UP FROM LITHIA FORD, BOISE, IDAHO.
> UNFORTUNATELY I HAVE EXPERIENCED THE
> UNEXPECTED OPENING OF MY TAIL GATE

---

[16] NHTSA ID 11287786.

[17] NHTSA ID 11282958 (emphasis added).

NUMEROUS TIMES WHILE TURNING STREET CORNERS, IN MOTION, ON BOISE, IDAHO, CITY STREETS, WHILE PULLING MY RV, AND AT RANDOM TIMES. ***IT HAS RESULTED IN DAMAGING MY RV PROPANE TANKS, AND RESULTED IN TWO PERMANENT DENTS AT THE TOP OF MY TAIL GATE. THE LAST INCIDENT OCCURRED NOVEMBER 15, 2019 WHEN TURNING A STREET CORNER, MY TAIL GATE FELL OPEN, AND MY NEW (NEVER SHOT .17 CAL RIFLE (IN A HARD BLACK PLASTIC CASE)) RIFLE FELL OUT, AND WAS NEVER RECOVERED***. I FILED A POLICE REPORT WITH THE GARDEN CITY POLICE DEPARTMENT #2019-02600. I EVEN HAD ONE INCIDENT WHERE THE TAIL GATE FELL OPEN, WHILE STATIONARY IN MY DRIVE WAY. I INITIALLY THOUGHT THAT I HAD CAUSED THE INCIDENTS, INADVERTENTLY WHILE CARRYING MY REMOTE KEY IN MY POCKET, BUT SINCE READING THE "HTTP://WWW.TFLTRUCK.COM REPORT/2018/10/2017-FORD-SUPER-DUTY-POWERED-TAILGATE-MAY-OPEN-BY-ITSELF-OWNERS-REPORT/", I BELIEVE THAT IT MAY BE A WIRING HARNESS PROBLEM, WHICH FORD HAS IDENTIFIED AS A POSSIBLE PROBLEM.[18]

108.    On October 2, 2019, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA:

ON MORE THAN ***20 SEPARATE OCCASIONS THE TAILGATE HAS RANDOMLY OPENED ON ITS OWN WHILE TRUCK WAS IN MOTION*** ON HIGHWAY. IN ONE INSTANCE ***THIS ALLOWED THE LOAD I WAS CARRYING AT 55 MPH TO FALL***

---

[18] NHTSA ID 11280835 (emphasis added).

29

*OUT THE BACK OF THE TRUCK AND ONTO THE
HIGHWAY NEARLY CAUSING AN ACCIDENT.*[19]

109.   On September 12, 2019, the owner of a 2017 Ford F-250 filed the

following complaint with NHTSA:

> I HAVE OWNED A 2017 F250 SUPER DUTY
> VEHICLE FOR A LITTLE OVER A YEAR AND
> TWICE THE TAILGATE HAS OPENED WHEN
> DRIVING. THE FIRST TIME WAS NOT LONG AFTER
> I HAD THE TRUCK IN THE FALL OF 2018 AND
> THOUGHT MAYBE I HAD LEFT IT DOWN,
> ALTHOUGH IT MADE NO SENSE SINCE I HAD NOT
> LOADED ANYTHING IN THE BED OF THE TRUCK,
> BUT SOMEONE WAVED ME DOWN IN THE
> NEIGHBORHOOD AS I WAS DRIVING OUT OF THE
> NEIGHBORHOOD. HOWEVER, ON THE
> EXPRESSWAY, LESS THAN FIVE WEEKS AGO, IN
> AUSTIN, TEXAS (WE LIVE IN ATLANTA AND WAS
> VISITING OUR SON,) *THE TAILGATE CAME DOWN
> AND A PIECE OF LUGGAGE FELL OUT IN HEAVY
> TRAFFIC AND I WAS ONLY NOTIFIED OF THE
> PROBLEM AFTER SEVERAL DRIVERS CAME UP
> BESIDE US AND YELLED OUT THEIR WINDOWS
> THAT THE TAILGATE WAS DOWN.* TO MY
> KNOWLEDGE NO AUTO WAS DAMAGED BEHIND
> US BUT HARD TO KNOW FOR SURE SINCE WE
> WERE GOING ABOUT 35 MILES PER HOUR AND
> NOT SURE HOW FAR BACK THE PIECE OF
> LUGGAGE FELL OUT. SADLY IT HAD SOME OF MY
> WIFE'S MEDICINES AND OTHER ITEMS
> AMOUNTING TO APPROXIMATELY $600 IN
> TOTAL VALUE AND WE COULD NOT RECOVER
> THE PIECE OF LUGGAGE. LUCKILY THE OTHER
> ITEMS DID NOT FALL OUT (SEVERAL HEAVY
> BOXES OF ITEMS FOR OUR SON). IN LOOKING
> ONLINE TODAY, I FOUND THAT OTHER OWNERS

---

[19] NHTSA ID 11265643 (emphasis added).

HAVE HAD THIS PROBLEM AND WANTED TO REPORT IT. I WILL BE GLAD TO FURNISH ADDITIONAL INFORMATION IF REQUIRED.[20]

110.   The owner of a 2018 Ford F-250 filed the following complaint with NHTSA:

THE TAILGATE IS COMING DOWN WHILE DRIVING ALL BY ITS SELF. *IT HAS ALREADY BEEN CRUSHED BY A TRAILER THAT WAS BEING PULLED AND FORD WILL NOT COVER THE COST OF THE REPLACEMENT*[21]

111.   On July 11, 2019, the owner of a 2018 Ford F-250 filed the following complaint with NHTSA:

WHILE PUTTING MY F250 IN GEAR (DRIVE), THE TRUCK TAILGATE WAS AUTOMATICALLY OPENED, WHICH THEN CRUNCHED INTO MY GOOSE NECK TRAILER WHEN MAKING A RIGHT HAND TURN. THE TAIL GATE HAS OPENED 3 TIME, WITHOUT USER INTERVENTION, IN THE FIRST 6 WEEKS I'VE OWNED THE VEHICLE.[22]

112.   On May 12, 2019, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA:

TAILGATE OPENED (ON ITS' OWN) WHILE DRIVING AND TOWING A FIFTH WHEEL CAMPER ON HIGHWAY DURING RAIN. *TAILGATE WAS DAMAGED AND CAUSED EXTENSIVE DAMAGE TO FRONT OF CAMPER. CONTENTS IN TRUCK*

---

[20] NHTSA ID 11255126 (emphasis added).

[21] NHTSA ID 11231066 (emphasis added).

[22] NHTSA ID 11208637.

***BED WERE LOST WHILE TRAVELING (ON HIGHWAY)***.[23]

113.   On March 12, 2019, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2017 FORD F-250. THE CONTACT STATED THAT THE TAILGATE OPENED ON ITS OWN. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO QUIRK FORD (540 SOUTHERN ARTERY, QUINCY, MA 02169, (617) 770-0070) AND THE TAILGATE HINGES WERE GREASED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 15,500.[24]

114.   On January 23, 2019, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2017 FORD F-250. WHILE DRIVING 55 MPH, THE AUTOMATIC TAILGATE ACTIVATED INDEPENDENTLY. THE CONTACT PULLED THE VEHICLE OVER OFF OF THE ROADWAY AND CLOSED THE TAILGATE. WHEN THE CONTACT RE-ENTERED THE VEHICLE, THE TAILGATE ACTIVATED INDEPENDENTLY AGAIN. THE VEHICLE WAS TAKEN TO GJOVIK FORD INC (LOCATED AT 2600 US-34, SANDWICH, IL 60548, (630) 552-8058) WHERE IT WAS DIAGNOSED THAT WATER MADE CONTACT WITH THE WIRING HARNESS THAT CONTROLLED THE TAILGATE. THE VEHICLE WAS NOT

---

[23] NHTSA ID 11207090 (emphasis added).

[24] NHTSA ID 11186146.

REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 37,000.[25]

115.   On January 22, 2019, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA:

TL* THE CONTACT OWNS A 2017 FORD F-250. WHILE THE VEHICLE WAS REVERSING AND TOWING A 26 FOOT TRAILER, THE TAILGATE DROPPED DOWN AND CRASHED ONTO A TOOL BOX. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO FIVE STAR FORD (3800 HIGHWAY 78, SNELLVILLE, GA 30039, (678) 384-4242) WHERE IT WAS DETERMINED THAT THE VEHICLE WAS NOT COVERED UNDER A WARRANTY. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS CONTACTED AND PROVIDED CASE NUMBER: [XXX]. A DECISION ON REPAIRING THE VEHICLE WAS PENDING. THE FAILURE MILEAGE WAS 75,000. *BF[26]

116.   On October 25, 2018, the owner of a 2017 Ford F-250 filed the following complaint with NHTSA:

TAILGATE HAS BEEN OPENING ON ITS OWN WHILE DRIVING. THE LAST TIME THIS HAPPENED I WAS DRIVING WITH A TRAILER ATTACHED AND THE TAILGATE DROPPED WHILE DRIVING AND THE TAILGATE AND TRAILER WERE DAMAGED. *NOT SURE WHAT CAUSED THE TAILGATE TO OPEN ON ITS OWN. KEY FOB WAS ON THE DASH WHEN THIS*

---

[25] NHTSA ID 11171685.

[26] NHTSA ID 11171409.

> ***HAPPENED SO COULDN'T OF BEEN PUSHED ON***
> ***ACCIDENT. VEHICLE WAS IN MOTION ON***
> ***HIGHWAY.*** DAMAGE OCCURED WHEN TURNING,
> THE TAILGATE CAUGHT THE CARGO DOOR(S) OF
> THE ATTACHED FIFTH-WHEEL TRAILER.[27]

117.  On October 17, 2018, the owner of a 2017 Ford F-250 filed the

following complaint with NHTSA:

> I RECENTLY PARKED MY TT AT OUR NEW RV
> CAMPGROUND. WHILE BACKING IT UP THE GATE
> OPENED RANDOMLY IN THE MIDDLE OF A TURN
> AND DENTED THE TOP OF MY TAILGATE.
> EXTREMELY UPSET I NEW IT WAS GOING TO BE
> A HARD CASE TO SUBMIT TO WARRANTY FOR
> THEM TO BELIEVE THAT IT WASN'T USER
> ERROR. A FEW DAYS LATER I LEFT WORK AND
> DROVE 20 MILES DOWN THE HIGHWAY ONLY TO
> GET TO WHERE I WAS GOING AND GET OUT OF
> MY TRUCK TO SEE THE TAILGATE DOWN WITH A
> FULL PROPANE TANK IN THE BACK AN A $1000
> WORTH OF FISHING POLES. TODAY I TOOK MY
> WIFE TO LUNCH AND WHEN WE PARKED AND
> GOT OUT THE GATE WAS DOWN AGAIN. WE ATE
> WENT A FEW MILES DOWN THE ROAD, SHOPPED
> AND UNLOCKED THE DOORS USING THE FOB
> AND THE GATE DROPPED. THAT'S TWICE IN ONE
> DAY. IT WAS GETTING WORSE. SHORTLY AFTER,
> I GOT A LAST MINUTE CALL TO MOVE MY TT
> DUE TO RISING WATERS HERE IN BUCHANAN AT
> THE RV PARK AND WHILE I WAS GETTING
> READY TO LEAVE THE GATE OPENED ON ITS
> OWN WHILE THE DOORS WERE UNLOCKED. SO I
> GOT OUT MY CAMERA AND CLOSED THE GATE.
> WITHIN 20 SECONDS IT OPENED AGAIN. THIS
> TIME I VIDEO TAPED IT AND TEXTED THE VIDEO
> TO MY FORD WARRANTY REP. I RUSHED MY

---

[27] NHTSA ID 11142657 (emphasis added).

> TRUCK TO COVERT FORD AND BY GODS GOOD
> GRACE THE TAILGATE OPENED REPEATEDLY IN
> FRONT OF EVERY FORD REP WORKING. I'LL LET
> YOU KNOW WHAT THEY FIND. MY TRUCK IS A
> 2017 F250 LARIAT ULTIMATE. I HAVE A VIDEO
> BUT IT IS 9.63MB. EMAIL ME IF YOU WANT IT.[28]

118.   On June 6, 2020, the owner of a 2017 Ford F-350 filed the following

complaint with NHTSA:

> WHILE DRIVING ON A CITY STREET ABOUT 40
> MPH THE TAILGATE OPENED BY ITSELF AND
> THE CARGO FELL OFF TO THE ROAD, THE CARGO
> WAS DAMAGED.*DT*JB*DT*JB[29]

119.   On December 21, 2019, the owner of a 2017 Ford F-350 filed the

following complaint with NHTSA:

> WHILE TOWING MY 5TH WHEEL TRAILER 65
> MILES,   THE TAILGATE OPENED   BY   ITSELF
> CAUSING      DAMAGE      TO      TRAILER
> AND TAILGATE.[30]

120.   On December 7, 2019, the owner of a 2019 Ford F-350 filed the

following complaint with NHTSA:

> 2019 F-350 WITH 8' BED AND APPROX 1000 MILES.
> 1ST OCCURRENCE: DEPARTED A CAMPGROUND
> TOWING A TRAVEL TRAILER (AFTER DOING 3
> WALK-AROUND SAFETY CHECK PRIOR TO
> DEPARTING). DROVE 10 MILES TO NEAREST GAS
> STATION BEFORE GETTING ON THE HIGHWAY

---

[28] NHTSA ID 11141075.

[29] NHTSA ID 11327541.

[30] NHTSA ID 11290633.

WHERE I DISCOVERED THE TAILGATE WAS DOWN AND CRUSHED BY THE TRAVEL TRAILER. THINKING BACK THROUGH MY SERIES OF EVENTS; I WAS ON LEVEL GROUND AND DID NOT REACH DOWN TO DISENGAGE THE PARKING BRAKE BELOW THE GATE RELEASE, I HAD A GROUND GUIDE BACK ME UP OUT OF MY SPOT WHO CONFIRMED GATE WAS STILL UP PRIOR TO DEPARTING, KEY WAS IN THE CUP HOLDER WITH NO OTHER OBJECTS. I REPORTED THIS ISSUE TO THE DEALER(4 SEPT 2019). THEY REVIEWED CURRENT RECALLS ON MY MODEL AND NONE WERE REPORTED. I FILED A CLAIM WITH MY INSURANCE AND ABSORBED THE REPAIR EXPENSES. IMPORTANT TO NOTE, THERE WAS A HEAVY THUNDERSTORM THE NIGHT PRIOR TO DEPARTING. 2ND OCCURRENCE: (WHILE AWAITING PARTS TO REPAIR DAMAGES FROM 1ST OCCURRENCE) I DEPARTED WORK AND JUST AFTER TURNING LEFT OUT OF THE PARKING SPOT STILL IN THE PARKING LOT, THE TAILGATE CAME OPEN UNINTENTIONALLY FOR THE SECOND TIME DURING MY 2 MONTHS OF OWNERSHIP. I IMMEDIATELY NOTICED IT DOWN WHEN I LOOKED IN MY REARVIEW MIRROR AND NO DAMAGES FROM THIS OCCURRENCE.[31]

121. On December 7, 2019, the owner of a 2018 Ford F-350 filed the following complaint with NHTSA:

TAILGATE OPENS ON ITS OWN...NO INDICATION THAT IT IS OPEN...CAN NOT SEE IN THE MIRROR.[32]

---

[31] NHTSA ID 11287665.

[32] NHTSA ID 11287650.

122.   On December 2, 2019, the owner of a 2019 Ford F-350 filed the following complaint with NHTSA:

> TAILGATE RANDOMLY OPENS WHILE DRIVING. HAS HAPPENED AT LEAST A DOZEN TIMES IN THE LAST SIX MONTHS. (JULY-NOV 2019)[33]

123.   On October 29, 2019, the owner of a 2018 Ford F-350 filed the following complaints with NHTSA:

> FORD 2018 F-350 SUPER DUTY UNCOMMANDED TAILGATE OPENING WITH 3577 MILES. VEHICLE CAN BE PARKED , STATIONARY, TURNING OR IN MOTION AND TAILGATE WILL OPEN ON ITS OWN WITHOUT WARNING. VEHICLE TAKEN TO FORD DEALER ON 3-SEPERATE OCCASION'S AND STILL UNABLE TO DUPLICATE TAILGATE ISSUE.   DEALER   DID STATE IT HAPPEN TO THEM ONCE IN THE SHOP. TOTAL OF 13 DAYS IN DEALER SHOP. I CALLED FORD CUSTOMER RELATIONSHIP CENTER AND WAS ADVISED TO TAKE VEHICLE BACK TO FORD DEALER. THIS VEHICLE IS EQUIPPED WITH ELECTRONIC TAILGATE THAT CAN BE OPENED WITH THE KEY FOBS. FORD DEALER HAS ADVISED ME FROM , HUMAN ERROR PUSHING TAILGATE BUTTON, GARAGE DOOR OPENER OR LOW BATTERY ON KEY FOBS. ALL THOSE ISSUES HAVE BEEN ADDRESSED WITHOUT ANY SUCCESS. I DID FIND ON LINE A IDENTICAL ISSUE AND A FORD SERVICE BULLETIN (TSB) 17-2196 WAS ISSUED ON A FORD 2017 SUPER DUTY TRUCKS BUT NOT FOR 2018 TRUCKS. AS OF THIS DATE I QUIT COUNTING AFTER 30-TAILGATE OPENINGS. I HAVE NOW ATTACHED A CHAIN ON TAILGATE TO INSIDE

---

[33] NHTSA ID 11286329.

TRUCK BODY TO PREVENT THE TAILGATE OPENING AND LOOSING MY CARGO IN TRUCK BED. NOTE: THERE IS NO MECHANICAL DEVICE TO LOCK THE TAILGATE OR TO OVERRIDE ELECTRICAL COMPONENT OF TAILGATE?[34]

124.    On July 30, 2019, the owner of a 2018 Ford F-350 filed the following complaint with NHTSA:

THE TAILGATE OPENS ON ITS OWN. THE LATEST INCIDENT, THE TAILGATE OPENED ON ITS OWN WHILE TRAVELING. INITIALLY I THOUGHT I MIGHT HAVE PRESS THE TAILGATE BUTTON BUT AFTER SECURING THE KEY TO ENSURE NOTHING PRESSES AGAINST THE BUTTON FOUND OUT THAT IS THAT IS NOT THE CASE. LATEST INCIDENT OCCURRED ON 29 JUL 19 AND CAUSE DAMAGE TO MY TRAVEL TRAILER AND THE TAILGATE ITSELF . I AM CURRENTLY USE S BUNGEE CORD TO SECURE THE TAILGATE FROM OPENING.[35]

125.    On July 26, 2019, the owner of a 2018 Ford F-350 filed the following complaint with NHTSA:

WE ARE EXPERIENCING NUMEROUS UNCOMMANDED TAILGATE DROPS WHILE THE VEHICLE IS IN MOTION OR JUST RUNNING. WE RECENTLY WERE TOWING OUR 5TH WHEEL TRAILER AND WHEN WE PULLED INTO FUEL UP OUR TAILGATE DROPPED AND DAMAGED BOTH THE TRUCK'S TAILGATE (TOP MOLDING) AND PUT A HOLE IN THE FRONT COMPARTMENT

---

[34] NHTSA ID 11276985.

[35] NHTSA ID 11240562.

DOOR OF THE FIFTH WHEEL. (PICTURES PROVIDED). WE HAVE TAKEN THE TRUCK INTO TWO FORD DEALERSHIPS AND THEY HAVE NOT BEEN ABLE TO DUPLICATE OR DIAGNOSE THE PROBLEM AND PER FORD MOTOR COMPANY, THEY HAVE STOPPED TRYING TO DIAGNOSE THE PROBLEM. ON ANOTHER DAY, WE EXPERIENCED THREE                                        DIFFERENT UNCOMMANDED TAILGATE DROPS  WHILE  WE WERE  TOWING  OUR  BOAT.  ONE  TIME,  MY HUSBAND WAS BACKING THE TRUCK AND I WAS STANDING   ALONGSIDE   THE   TRUCK   AND THE TAILGATE DROPPED UNCOMMANDED.[36]

126.   On July 19, 2019, the owner of a 2019 Ford F-350 filed the following complaint with NHTSA:

AT SOME POINT DURING A 2 HOUR INTERSTATE HIGHWAY               DRIVE,               THE POWER TAILGATE OPENED     ITSELF.     THIS DAMAGED       THE TAILGATE ITSELF,       AND SEVERELY DAMAGED THE FRONT OF THE FIFTH WHEEL  TRAILER  THAT  I  WAS  TOWING.  THE PROBLEM  WAS  NOTICED  WHEN  WE  TURNED INTO  OUR  CAMPGROUND  AND  HEARD  A GRINDING/POPPING NOISE BEHIND US.[37]

127.   On May 2, 2019, the owner of a 2018 Ford F-250 filed the following complaint with NHTSA:

THE TAILGATE WILL   COME   DOWN   WHILE RIDING DOWN THE ROAD OR AFTER HITTING A BUMP.  VERY  UNSAFE  WHILE  HAULING  OR TOWING.  THERE  IS  NO  INDICATOR  IN  THE  CAB

---

[36] NHTSA ID 11235009.

[37] NHTSA ID 11233267.

TO TELL YOU THE TAILGATE HAS DROPPED. HAVE HAD IT IN FOR SERVICE AT LEAST 4 TIMES. VEHICLE IS LESS THAN A YEAR OLD.[38]

128.   On May 8, 2017, the owner of a 2017 Ford F-350 filed the following

complaint with NHTSA:

THE 2017 FORD SUPERDUTY TRUCKS HAVE A REMOTE TAILGATE RELEASE IN THE LARIAT AND KING RANCH MODELS. THE TAILGATE OF MY TRUCK AND OTHERS HAVE DROPPED WITHOUT ACTION FROM THE USER. THIS MAKES THESE VEHICLES UNSAFE WHEN CARRYING CARGO THAT IS ONLY SECURED BY THE TAILGATE OR WHEN TOWING 5TH WHEEL TRAILERS. MINE HAS DROPPED SOME 16 TIMES SINCE NOVEMBER. APPARENTLY FORD DEALERS ARE UNIVERSALLY BLAMING THE OPERATORS FOR ACCIDENTALLY PUSHING THE TAILGATE BUTTON TWICE ON THE FOB. *HOWEVER, I HAD AN ACCIDENT ON MAY 6TH, WHEN I COULD NOT HAVE PUSHED THE BUTTON ON THE FOB. THE TAILGATE DROPPED, AFTER I DROVE OVER 65 MILES ON MOUNTAIN ROADS - JUST AS I WAS ENTERING AN INTERSTATE ON-RAMP. MY TRUCKS TAILGATE AND MY 5TH WHEEL CAMP TRAILER WERE BOTH DAMAGED*. FORTUNATELY I WAS NOT IN TRAFFIC. THE DAMAGE TO THE 5TH WHEEL WAS JUST UNDER THE PROPANE TANKS AND NEAR THE MAIL POWER BUS. I AM CHANGING THE TRUCK WIRING TO DISCONNECT POWER TO THE TAILGATE, BUT THIS IS REALLY NOT A SATISFACTORY FIX. ON LINE I FOUND AT LEAST 3 OTHER INSTANCES OF THIS PROBLEM. WHETHER THE OPERATORS AND

---

[38] NHTSA ID 11205304.

UNKNOWINGLY ACTIVATING THE TAILGATE RELEASE OR THE FOBS ARE FAULTY OR THE ELECTRICAL SYSTEMS ARE FAULTY OR WHATEVER THE CAUSE, THE RESULT IS A HAZARD THAT CAN CAUSE LOSS OF VEHICLE/ TRAILER CONTROL OR THE DROPPING OF CARGO ON THE HIGHWAYS. THIS IS A HAZARD THAT NEEDS FIXING BY FORD. *TT[39]

129. On October 17, 2018, the owner of a 2017 Ford F-350 filed the following complaint with NHTSA:

MY TAILGATE OPENED UP WHILE PULLING A CAMPER WHILE IN A RIGHT TURN AND CAUSED DAMAGE TO THE TAILGATE AND 5TH WHEEL CAMPER WHICH I WAS TOWING[40]

130. On October 29, 2018, the owner of a 2018 Ford F-350 filed the following complaint with NHTSA:

WHILE PULLING FROM A FUEL PUMP I BEGAN TURNING WHEN I HEARD A LOUD NOISE. THE TAILGATE HAD INADVERTENTLY OPENED AND PIERCED THROUGH THE FRONT OF A 5TH WHEEL CAMPER I WAS PULLING. THIS CAUSED SIGNIFICANT DAMAGE TO THE CAMPER AS WELL AS THE TO THE TOP OF THE TAILGATE. THIS 1ST INCIDENT HAPPENED ~ 3700 MILES. I LATCHED THE TAILGATE AND PICKED UP ANOTHER TRAILER (PINTLE HITCH). I PULLED INTO A PARKING LOT TO DROP OFF THE LOAD AND NOTICED THAT THE TAILGATE HAD CAME DOWN A SECOND TIME. AFTER DROPPING TRAILER OFF I BEGAN TO DRIVE HOME. HALF

---

[39] NHTSA ID 10984283 (emphasis added).

[40] NHTSA ID 11141071.

> WAY HOME TO GET FUEL (UN LADEN) I NOTICED
> THE TAILGATE DOWN AGAIN. THE REMOTE NOR
> THE DASH BUTTON HAD BEEN TOUCHED.
> THE TAILGATE HAS SINCE BEEN REMOVED AS I
> CAN NOT RISK FURTHER DAMAGE CAUSED
> FROM MY TAILGATE OPENING BY ITSELF. I
> INFORMED MY DEALERSHIP (RYAN FORD OF
> SEALY,TX.) MULTIPLE TIMES OF THE INCIDENT
> HOWEVER WAS REPLIED WITH ONLY THAT
> THERE WAS NO ACTIVE TSB ISSUES FOR MY
> VIN.[41]

131.   On November 24, 2018, the owner of a 2017 Ford F-350 filed the

following complaint with NHTSA:

> FORD TAIL GATE OPENS SPONTANEOUSLY
> WHILE IN MOTION. IT HAS HAPPENED 3 TIMES. IT
> HAS DAMAGED MY TRAVEL TRAILER AND THE
> TOP OF THE TAILGATE. THE LATEST
> OCCURRENCE WAS 11/8/18. I DON'T RECALL THE
> OTHER DATES. IT IS UNKNOWN WHEN IT
> OPENED. I REALIZED THAT IT HAD OPENED
> WHEN I HEARD THE CRUNCHING SOUND IT
> THE TAILGATE DAMAGING MY TRAILER.I HAVE
> NOT WAY OF KNOWING WHEN
> THE TAILGATE OPENED, I ONLY KNOW WHEN IT
> CAUSED DAMAGE TO MY TRAILER. I AM
> RELUCTANT TO PUT CARGO IN MY TRUCK
> BECAUSE IT COME OUT AND DAMAGE
> PROPERTY OR KILL SOMEONE.[42]

132.   On November 30, 2018, the owner of a 2018 Ford F-350 filed the

following complaint with NHTSA:

---

[41] NHTSA ID 11141476.

[42] NHTSA ID 11153541.

> ***TAILGATE WILL OPEN RANDOMLY WHEN HITTING A BUMP ON THE ROAD OR HIGHWAY***. HAS HAPPENED 4 TIMES IN THE FIRST 6 MONTHS I HAVE OWNED. THE DEALERSHIP CAN FIND NO PROBLEM. ***RESULTED IN LOOSING MY PAYLOAD ON THE INTERSTATE, VERY DANGEROUS***.[43]

133. On December 18, 2019, the owner of a 2017 Ford F-450 filed the following complaint with NHTSA:

> TAILGATE TO TRUCK HAS OPENED 3 TIMES WHILE DRIVING BETWEEN SEPTEMBER AND NOVEMBER 2019. I AM NOT SURE AT THE EXACT TIME AND CONDITIONS THAT THE TAILGATE OPENED BUT WEATHER WAS RAINING MID-DAY ON TWO OF THE OCCASIONS, THE THIRD WAS EARLY MORNING. ONE OF THE TIMES THE TAILGATE OPENED WAS WHILE TOWING A CARGO TRAILER WHICH RESULTED IN DAMAGE TO THE TOP OF THE TAILGATE AS IT FELL ON THE TRAILER TONGUE JACK HANDLE. AS A NEWLY RETIRED NAVY PILOT I 'PRE-FLIGHT' MY TRUCK AND TRAILER BEFORE EVERY DRIVE CHECKING SAFETY CHAINS, LOCKS, TIRES AND LIGHTS.[44]

134. On December 2, 2019, the owner of a 2017 Ford F-450 filed the following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2017 FORD F-450. WHILE DRIVING 10 MPH AND HAULING A TRAILER, THE CONTACT ATTEMPTED TO MAKE A HARD RIGHT TURN WHEN, WITHOUT WARNING, THE TAILGATE DISENGAGED AND

---

[43] NHTSA ID 11155215 (emphasis added).

[44] NHTSA ID 11289792.

FELL TO THE GROUND. THE TAILGATE WAS DESTROYED. THE VEHICLE WAS TOWED TO THE CONTACT'S RESIDENCE. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE DEALER AND MANUFACTURER WERE NOT CONTACTED. THE FAILURE MILEAGE WAS APPROXIMATELY 55,700.[45]

135.   On April 8, 2019, the owner of a 2017 Ford F-450 filed the following complaint with NHTSA:

I HAVE A 2017 FORD SUPER DUTY F450 PLATINUM. MULTIPLE TIME THE TAILGATE HAS DROPPED O ITS OWN WHILE IM DRIVING THE TRUCK. KEYS ARE RESTING IN CONSOLE NOT TOUCHING RELEASE BUTTON AND DROPS ON ITS OWN. HAVE CHECKED AND DOUBLED CHECKED CLOSING FIRMLY. STILL OPENS INTERMITTENTLY. I HAVE HAD MULTIPLE WITNESSES WATCH IT HAPPEN. IT HAS NOW HAPPENED WHEN TOWING AND DESTROYED THE TAILGATE AND COULD OF CAUSED AND ACCIDENT.[46]

136.   On January 4, 2019, the owner of a 2018 Ford F-450 filed the following complaint with NHTSA:

THE POWER TAILGATE OPENS RANDOMLY ON ITS OWN. THIS HAS RESULTED IN DAMAGE TO MY TAILGATE AND THE ATTACHED TRAILER. I HAVE SECURITY VIDEO FOOTAGE OF IT OPENING RIGHT BEFORE AS I STARTED TO DRIVE. FORD IS REFUSING TO REPAIR IT UNDER WARRANTY. THE TRUCK HAS 3800 MILES ON IT

---

[45] NHTSA ID 11286313.

[46] NHTSA ID 11194683.

> AND HAS NOT EVEN HAD ITS FIRST OIL CHANGE.
> THIS COULD HAVE CAUSED A SERIOUS WRECK
> IF I HAD BEEN ON THE INTERSTATE.[47]

137.   On September 8, 2020, the owner of a 2019 Ford F-450 filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2019 FORD F-450. THE
> CONTACT STATED WHILE DRIVING 35 MPH,
> THE TAILGATE FELL AND DENTED THE HORSE
> TRAILER. THE CHECK ENGINE WARNING LIGHT
> WAS ILLUMINATED. THE LOCAL DEALER WAS
> NOT CONTACTED. THE VEHICLE WAS NOT
> DIAGNOSED        NOR        REPAIRED.        THE
> MANUFACTURER    WAS    CONTACTED    AND
> REFERRED THE CONTACT TO NHTSA. THE
> FAILURE MILEAGE WAS 10,838.*DT*JB*JB[48]

138.   On July 25, 2019, the owner of a 2019 Ford F-350 SD filed the

following complaint with NHTSA:

> LESS THAN 500 MILES ON A F350 SUPERDUTY
> WITH AN 8' BED. DRIVING WITH A SMALL BOAT
> IN THE BACK PROPPED UP ON THE BACK OF
> THE TAILGATE. TAKING A LEFT ON A GREEN
> LIGHT     IN     THE     CITY     GOING     ~15MPH
> *THE TAILGATE OPENED ON ITS OWN AND THE*
> *BOAT ALMOST SLID OUT OF THE TRUCK. DID*
> *NOT PRESS THE FOB AS IT WAS IN THE*
> *CUPHOLDER -- DID NOT PRESS THE BUTTON*
> *INSIDE ABOVE THE PARKING BRAKE BECAUSE I*
> *HAD BOTH HANDS ON THE STEERING WHEEL*
> *TO MAKE THE TURN. ALMOST LOST THE BOAT*
> *AS    I    HAD    IT    TIED    WHILE    PROPPED*

---

[47] NHTSA ID 11165240.

[48] NHTSA ID 11353814.

> ***ON TAILGATE, THE STRAPS CAME LOOSE SINCE THE BOAT FELL 2 FEED***. DID NOT CALL THE DEALER YET AND I PURCHASED THIS TRUCK 7 DAYS AGO. I WANT TO REPORT THIS BECAUSE THIS STILL APPEARS TO BE A PROBLEM ON THE 2019 MODELS.[49]

139. On July 6, 2019, the owner of a 2017 Ford F-350 SD filed the following complaint with NHTSA:

> TAILGATE OPENS ON ITS OWN WITHOUT DRIVER COMMAND WHILE DRIVING[50]

140. On April 25, 2018, the owner of a 2017 Ford F-350 SD filed the following complaint with NHTSA:

> THE REAR TAILGATE WILL OPEN RANDOMLY ON IT'S OWN. I'VE TAKEN IT IN AND NOTHING WAS DONE . THIS COULD CAUSE A SERIOUS ACCIDENT WHEN TOWING A 5TH WHEEL BECAUSE THE TAILGATE WOULD HIT THE TRAILER. WHEN THIS HAPPENS POTENTIAL LOSS OF STEERING COULD HAPPEN. *TT[51]

141. On April 25, 2019, the owner of a 2017 Ford F-250 SD filed the following complaint with NHTSA:

> TAILGATE HAS OPENED ON ITS OWN MULTIPLE TIMES WHILE DRIVING. THE TAILGATE IS NOW

---

[49] NHTSA ID 11234684 (emphasis added).

[50] NHTSA ID 11229732.

[51] NHTSA ID 11090089.

DAMAGED, IT WAS CAUGHT AGAINST MY TRAILER WHILE DRIVING.[52]

142. On March 25, 2019, the owner of a 2017 Ford F-250 SD filed the following complaint with NHTSA:

> I AM HAVING THE SAME ISSUE AS IN CASE # PE18-011. MY TAILGATE WILL OPEN RANDOMLY ON ITS OWN. THE TAILGATE RELEASE WILL ACTUATE OVER AND OVER WHEN THE BUTTON IS PUSHED ONCE. TOOK IT TO A FORD DEALER AND THEY CONFIRMED THAT IT IS THE SAME ISSUE AS TSB 17-2196. WATER GETS INTO A WIRING HARNESS. THIS SHOULD BE A SAFETY RECALL AS THE TAILGATE OPENING WHILE TOWING COULD CAUSE A LIMIT TO STEERING ABILITY AS THE TAILGATE CAN MAKE CONTACT WITH THE FRONT OF THE TRAILER. IT CAN ALSO CAUSE DAMAGE TO THE TAILGATE ITSELF IF IT LANDS ON SOMETHING.[53]

143. December 12, 2018, the owner of a 2017 Ford F-250 SD filed the following complaint with NHTSA:

> AUTOMATIC TAILGATE ASSIST JUST RANDOMLY GOES DOWN EITHER WHILE DRIVING, WHILE IN PARK, OR EVEN JUST FOR NO REASON. ***THIS HAPPENED WHILE IN PARK WITH A TRAILER ON THE BACK AND CAUSED $2000 IN DAMAGE WHICH WE HAD TO PAY FOR***. LUCKILY ALL THE OTHER TIMES IT HAS HAPPENED, THERE WAS NOT A TRAILER ON THE BACK. ***WE WERE NOT TOUCHING THE KEY FOB, SO IT***

---

[52] NHTSA ID 11203615.

[53] NHTSA ID 11191353.

***DIDN'T GET "PINCHED" IN A POCKET OR ANYTHING***.[54]

144.   On July 11, 2017, the owner of a 2017 Ford F-350 SD filed the following complaints with NHTSA:

> TL\* THE CONTACT OWNS A 2017 FORD F-350 SD. WHILE DRIVING APPROXIMATELY 70 MPH, A NOISE WAS PRESENT COMING FROM THE REAR OF THE VEHICLE. AFTER STOPPING THE VEHICLE, IT WAS DISCOVERED THAT THE TAILGATE HAD ERRONEOUSLY OPENED. THE LOCAL DEALER (OSSEO FORD OF OSSEO, WISCONSIN) WAS NOTIFIED OF THE FAILURE AND REPLACED THE TAILGATE. THE CONTACT INDICATED THAT THE FAILURE OCCURRED ON SEVERAL OCCASIONS. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 7,000.[55]

145.   The above Class members' complaints represent a sampling of the voluminous complaints submitted to NHTSA.  In fact, hundreds of complaints by Class members about the Tailgate Defect are on NHTSA's website and other online resources, such as carcomplaint.com and ford-trucks.com.

146.   Ford, despite its knowledge, failed to disclose the Tailgate Defect to Plaintiffs or the other Class members.  Plaintiffs and the other Class members relied on Ford to disclose the Tailgate Defect.  Had Ford disclosed the Tailgate Defect,

---

[54] NHTSA ID 11160936 (emphasis added).

[55] NHTSA ID 11004227.

Plaintiffs and the other Class members would not have purchased or leased their Class Vehicles or would have paid less for them.

**D.    Ford Issued an Inadequate Recall of the Tailgate System**

147.   On October 12, 2018, NHTSA opened PE18-011 "to access the scope, frequency and safety consequences of the alleged defect."[56]

148.   NHTSA stated that it had received customer complaints alleging the tailgate was unintentionally opening.[57]

149.   NHTSA further stated that the:

> [The TSB] submitted to the agency by Ford on 16 October 2017, acknowledged the issue and finds water intrusion in the wire harness as the root cause. Consequences of an uncommanded tailgate opening include spilling of unsecured contents from truck bed and damage to other equipment to the vehicle.[58]

150.   As a result of PE18-011, Ford issued its Recall on December 4, 2019, recalling 231,664 model year 2017-2019 Class Vehicles.[59]

151.   In the Recall report, Ford admitted the existence of and the safety risk posed by the Tailgate Defect:

> water entering the electrical wiring system may cause a short circuit resulting in the unintended switch activation

---

[56] Exhibit B.

[57] *Id*.

[58] *Id*.

[59] Exhibit C.

and release of the tailgate latches. This could cause
unintended opening of the tailgate either when the vehicle
is not moving or is in motion.

152.   Specifically, Ford stated that it inspected Class Vehicles and found

"evidence of water in various electrical components, including wiring harness

connectors, eyelets, splices or the tailgate switch."[60]

153.   Moreover, Ford admitted the Tailgate Defect is a serious safety defect:

"Unintended tailgate opening without vehicle operator knowledge may result in loss

of unrestrained cargo, increasing the risk of a crash."[61]

154.   Ford offered a remedy under the Recall:

Dealers will modify the tailgate/frame wiring harnesses by
adding jumper pigtails to isolate the tailgate release
control circuits, and will install a new tailgate handle
release switch.

***

The additional wiring harness jumper isolates power and
ground circuits in separate connectors to prevent short
circuiting of the release switch. The new tailgate handle
release switch (p/n GB5T-14K147-CA) also has been
updated to further prevent water entry into the switch and
electrical system.

155.   Ford stated that model year 2020 and newer Class Vehicles are not

affected: "An updated tailgate release switch and wiring harness jumper were

---

[60] *Id.*

[61] *Id.*

incorporated into production effective with the 2020 model year on November 4, 2019."[62]

156.   As a result of Ford's Recall, NHTSA closed PE18-011.[63]   However, NHTSA noted that "[t]he closing of this investigation does not constitute a finding by NHTSA that a safety-related defect does not exist on other model or MY vehicles outside of the recall scope."

157.   Ford's Recall was inadequate because it failed to adequately remedy the Tailgate Defect with an improved tailgate system.   For example, on January 15, 2021, NHTSA opened RQ21-001 "to further assess the scope, frequency, and safety consequences of the alleged defect in the remedy provided by [the Recall]."[64]

158.   NHTSA noted that it "has received 11 Vehicle Owner Questionnaires (VOQs) and additional manufacturer Field Reports alleging unintended power tailgate openings in vehicles previously remedied under the recall."[65]

159.   Further, scores of customers submitted complaints to NHTSA citing Tailgate Defect symptoms *after* receiving the Recall repair.   For example, on January

---

[62] *Id*.

[63] NHTSA's PE18-011 Closing Resume is attached hereto as Exhibit F.

[64] Exhibit E.

[65] *Id*.

25, 2021, the owner of a 2017 Ford F-250 filed the following complaint with

NHTSA:

> TAILGATE OPENED ON ITS OWN WHILE DRIVING
> 4X SO FAR. THIS IS AFTER IT WAS TAKEN IN FOR
> A RECALL ABOUT 2 YEAR?S AGO. EACH TIME I
> WAS DRIVING AND IT HAPPENED WITH THE
> FIRST 10 MINUTES. I WAS IN THE MOUNTAINS
> CAMPING WHEN IT HAPPENED[66]

160.   On November 11, 2020, the owner of a 2019 Ford F-250 filed the

following complaint with NHTSA:

> HAD TAILGATE RECALL  DONE  IN  FEBRUARY
> 2020. TAILGATE CONTINUES  TO  OPEN  ON  ITS
> OWN.  DEALER  CAN?T  FIND  THE  PROBLEM.
> RECENT  INCIDENT  11/9/2020 TAILGATE OPENED
> TWICE  WHILE  ON  ROAD  AND  DAMAGED  5TH
> WHEEL  CAMPER  CARGO  DOOR.  VEHICLE  AT
> DEALER  3  DAYS  COULDN?T  GET  TAILGATE  TO
> REPEAT  INCIDENT.  ADVISED  NOTHING  THEY
> CAN       DO.       PRIOR       TO       LEAVING
> DEALER TAILGATE WOULDN?T  OPEN.  RECALL
> FIX HAS NOT WORKED. I SEARCHED INTERNET
> AND  FOUND  NUMEROUS  OTHERS  WHO  ARE
> HAVING SAME PROBLEM.[67]

161.   On November 1, 2020, the owner of a 2019 Ford F-250 filed the

following complaint with NHTSA:

> TRUCK TAILGATE OPENS RANDOMLY. THIS WAS
> A PROBLEM ON OVER 20 OCCASIONS BEFORE
> THE FORD SUPERDUTY TAILGATE RECALL WAS

---

[66] NHTSA ID 11389178.

[67] NHTSA ID 11374369.

IMPLEMENTED. ***HOWEVER, SINCE THE RECALL FIX WAS IMPLEMENTED ON MY TRUCK IN MARCH 2020, THE TAILGATE HAS OPENED ON IT'S OWN AT LEAST 6 MORE TIMES***! USUALLY I DISCOVER THE TAILGATE HAS OPENED UPON REACHING A DESTINATION, BUT OF THE SEVERAL TIMES IT HAS OPENED AND I'VE HEARD THE THUNK, IT SEEMS TO OCCUR WHEN THE TRUCK IS AT REST AND I HAVE JUST SHIFTED THE TRANSMISSION FROM PARK TO DRIVE, DRIVE TO REVERSE, REVERSE TO DRIVE, ETC. MOST RECENTLY ON 10/26/2020.[68]

162.   On August 14, 2020, the owner of a 2018 Ford F-250 filed the following complaint with NHTSA:

MY TRUCK TAILGATE IS OPENING WITHOUT CAUSE. IT HAPPENED 3 TIMES BEFORE A RECALL WAS SUPPOSEDLY COMPLETED IN JANUARY AND HAS HAPPENED 3 TIMES SINCE. TWICE WHEN PULLING A TRAILER JUST AFTER STARTING TO BACKUP. THAT LAST WAS WHEN MY CAR PLAY MALFUNCTIONED WITH THE APPLE PHONE. DURING TROUBLESHOOTING WORK THE TAILGATE OPENED WHILE SITTING IN MY DRIVEWAY. I HAVE DAMAGE TO THEN GATE CAUSED BY A TRAILER STRIKE ON 1 OPENING AND THE DEALERSHIP IS NOT HELPFUL AND HAS NOT TAKEN THIS SERIOUSLY. THIS WILL HAPPEN AGAIN.[69]

---

[68] NHTSA ID 11372546 (emphasis added).

[69] NHTSA ID 11349252.

163.   On January 28, 2021, the owner of a 2018 Ford F-350 filed the following complaint with NHTSA:

> UNCOMMANDED TAILGATE OPENING. TAILGATE FELL DOWN GOING ABOUT 30MPH IN DOWNTOWN PORT TOWNSEND, WA. ...***PORTABLE GENERATOR AND CABLE FELL IN FRONT OF SEVERAL CARS..TEMPORARILY SHUTTING DOWN BOTH LANES.*** THE NEXT DAY THE TAILGATE WOULD NOT RESPOND UNTIL THE CIRCUIT BREAKER WAS RESET. THIS TRUCK HAS HAD THE RECALL COMPLETED.[70]

164.   On January 26, 2021. The owner of a 2019 Ford F-350 filed the following complaint with NHTSA:

> TAILGATE RECALL (FORD # 19S48) WAS PERFORMED IN SPRING OF 2020. SUPPOSED TO FIX ELECTRONIC TAILGATES FROM OPENING INADVERTENTLY. IN OCTOBER OF 2020, MY TAILGATE DROPPED WHILE PULLING TRAILER, CAUSING DAMAGE TO TAILGATE.[71]

165.   On January 22, 2021, the owner of a 2019 Ford F-350 filed the following complaint with NHTSA:

> WHILE TOWING OUR FIFTH WHEEL CAMPER ON TWO SEPARATE OCCASIONS, THE TAILGATE OF OUR 2019 FORD F-350 DUALLY OPENED RANDOMLY WHILE IN TRANSIT. WITHOUT KNOWING THE TAILGATE WAS DOWN, IT CAUSED DAMAGE TO THE FRONT OF OUR FIFTH

---

[70] NHTSA ID 11390563 (emphasis added).

[71] NHTSA ID 11389979.

WHEEL WHEN MAKING TURNS. THIS OCCURRED ON TWO DIFFERENT HIGHWAYS BUT SINCE WE DON?T KNOW WHEN IT LOWERED, WE DON?T KNOW THE EXACT HIGHWAY CONDITIONS AT THE TIME. RAIN WAS NOT A FACTOR. SO FAR, IT HAS ONLY OPENED WHEN THE TRUCK WAS CONNECTED TO OUR FIFTH WHEEL. ACCORDING TO THE FORD DEALER, THE TAILGATE RECALL REPAIR HAVE ALREADY BEEN COMPLETED ON THIS VEHICLE. WE HAVE NOT REPORTED THIS DAMAGE TO OUR INSURANCE COMPANY AND HAVE NOT REPLACED THE CAMPER?S COMPARTMENT DOOR YET.[72]

166.   On January 21, 2021, the owner of a 2017 Ford F-350 filed the following complaint with NHTSA:

THE POWER TAILGATE WILL RELEASE WHILE IN MOTION. I HAD THE FORD RECALL COMPLETED ONCE, I BELIEVE AROUND SEPTEMBER OF 2020. I JUST HAD THE TRUCK BACK TO THE DEALER BECAUSE THE POWER TAILGATE FIX DOES NOT APPEAR TO CORRECT THE ISSUE. THEY JUST REMOVED THE ORIGINAL RECALLED PARTS AND DID THE RECALL AGAIN ON MY TRUCK. THIS CURRENT WORK WAS COMPLETED ON 1/20/21. PLEASE FORCE FORD TO DO A REPROGRAM OF THE BODY CONTROL MODULE TO INCLUDE NOTIFICATION WHEN THE TAILGATE IS OPEN IN THE DISPLAY IN THE DASH. I WILL HAVE TO WAIT AND SEE IF THE REINSTALLATION OF THE RECALL WILL CORRECT THE ISSUE, MY THOUGHTS ARE NOT.[73]

---

[72] NHTSA ID 11389402.

[73] NHTSA ID 11389255.

167.  On January 20, 2021, the owner of a 2018 Ford F-350 filed the

following complaint with NHTSA:

> I HAD THE TAILGATE RECALL COMPLETED ON
> MY VEHICLE, SHORTLY AFTERWARDS, I WAS
> STILL EXPERIENCING ISSUES WITH
> THE TAILGATE FALLING WHILE DRIVING. I
> RETURNED THE VEHICLE TO FORD AGAIN TO
> REPORT THE ISSUE. THE FORD DEALER WORKED
> ON THE VEHICLE FOR 2-3 DAYS AND RETURNED
> THE VEHICLE TO ME AGAIN STATING IT HAD
> BEEN FIXED. THE RECALL DID NOT RESOLVE
> THE ISSUE. THE TAILGATE OPENS
> UNEXPECTEDLY WHEN THE VEHICLE IS IN
> MOTION. I DO NOT KNOW IF IT HAPPENS ON THE
> FREEWAY, CITY STREET OR WHILE TURNING.[74]

168.  On November 18, 2020, the owner of a 2019 Ford F-350 filed the

following complaint with NHTSA:

> A FORD TRUCK TAILGATE RECALL HAS
> SATISFIED FEDERAL SAFETY REGULATORS WHO
> OPENED AN INVESTIGATION IN OCTOBER 2018
> FOLLOWING COMPLAINTS ABOUT ELECTRIC
> TAILGATES THAT SUDDENLY OPENED.*DT THE
> INVESTIGATION OPENED BY THE NATIONAL
> HIGHWAY TRAFFIC SAFETY ADMINISTRATION
> (NHTSA) INCLUDED ELECTRIC TAILGATE
> PROBLEMS IN 2017-2019 FORD F-250, F-350 AND F-
> 450 SUPER DUTY TRUCKS. THIS RECALL HAS NOT
> FIXED THIS ISSUE AND THE TAILGATE
> CONTINUES TO OPEN AND IS A SAFETY ISSUE.
> WE HAVE ATTEMPTED TO WORK WITH FORD
> MOTOR COMPANY LEGAL DIVISION FOR
> COMPENSATION AND A SOLUTION TO THIS BUT
> THEY WILL NOT COOPERATE. UNTIL NHTSA

---

[74] NHTSA ID 11389009.

RECOGNIZE THE RECALL IS A FAILURE, OWNERS WILL CONTINUE TO BE A SAFETY PROBLEM ON OUR HIGHWAYS. WHEN DID THIS HAPPEN? MULTIPLE TIMES! IT HAS BEEN TO 5 DEALERSHIPS TRYING TO RESOLVE THIS RECALL! THE DATE LISTED BELOW IS THE DATE WE PURCHASED OUR TRUCK. UPDATE: VEHICLE HAS BEEN REPAIRED BY A FORD DEALER.*JB[75]

169.    On August 11, 2020, the owner of a 2018 Ford F-350 filed the following complaint with NHTSA:

UNCOMMANDED TAIL GATE OPENING.. CONTINUES TO OPEN EVEN AFTER RECALL WAS COMPLETED.. THE CONSUMER STATED WHEN THE TAILGATE WOULD OPEN PERSONAL BELONGINGS WOULD FALL OUT OF THE VEHICLE. SEVERAL DEALERSHIPS WERE UNABLE TO DETERMINE THE FAILURE. AFTER HAVING THE TAILGATE REPAIRED UNDER RECALL, THE FAILURE PERSISTED. *JS[76]

170.    On July 9, 2020, the owner of a 2017 Ford F-350 filed the following complaint with NHTSA:

WHILE DRIVING ON THE HIGHWAY IN MY 2017 FORD F350 PICKUP AND PULLING A BUMPER PULL TRAILER THE TAILGATE RELEASED BY ITSELF AND LOWERED. IT CAME IN CONTACT WITH THE TRAILER JACK AND WHEN I PULLED OF THE ROAD IT DAMAGED THE TAILGATE. I HAD TAKEN THE TRUCK IN FOR A TAILGATE RECALL SEVERAL MONTHS PRIOR AND A SECOND TIME FOR THE TAILGATE NOT

---

[75] NHTSA ID 11375262.

[76] NHTSA ID 11348594.

OPENING. AUTOMAX FORD IN KILLEEN TX ADVISED ME THAT THE TECH FOUND NOTHING WRONG WITH THE RECALL WORK AND THEY WOULD NOT COVER THE ISSUE. WHEN THE TAILGATE WENT DOWN ON ITS OWN THE DOORS WERE LOCKED AND THE TRUCK WAS IN GEAR AND MOVING, BOTHE SAFETY FEATURES THAT SHOULD PREVENT THE TAILGATE FROM UNLOCKING'[77]

171.   On July 6, 2020, the owner of a 2019 Ford F-350 filed the following

complaint with NHTSA:

THIS MODEL HAS A SAFETY RECALL FOR TAILGATE OPENING UNINTENDEDLY. I HAD MY IN FOR THE RECALL REPAIR. MY TAILGATE UNINTENDEDLY OPENED AGAIN, AFTER THE RECALL REPAIR CAUSING DAMAGE TO IT AND MY TRAILER. THE TRUCK WAS ALSO LOADED WITH MIC ITEMS THAT COULD HAVE FALLEN OUT ON AT HIGHWAY SPEEDS. THERE IS A SUBSTANTIAL RISK OF MORE PROPERTY DAMAGE AND RISK TO OTHER MOTORISTS ON THE ROAD IF THIS ISSUE IS NOT CORRECTED.*DT*JB[78]

172.   On June 24, 2020, the owner of a 2018 Ford F-350 filed the following

complaint with NHTSA:

TAILGATE CAME OPEN ON ITS OWN YET AGAIN..TOWING A 5TH WHEEL..WAS ABLE TO SEE IT OPEN IN A SHARP TURN AND STOP..CAUSING A TRAFFIC JAM ON HIGHWAY 12. SEVERAL CARS ALMOST HIT EACH OTHER...THIS

---

[77] NHTSA ID 11338360.

[78] NHTSA ID 11337686.

> IS AFTER RECALL WAS COMPLETED .*DT*JB
> *TR[79]

173. On June 22, 2020, the owner of a 2018 Ford F-350 filed the following

complaint with NHTSA:

> TAILGATE OPENED ON ITS OWN...TOWING 5TH
> WHEEL TRAILER...THIS IS SECOND TIME
> SINCE TAILGATE RECALL WAS DONE.[80]

174. On June 8, 2020, the owner of a 2018 Ford F-350 filed the following

complaint with NHTSA:

> LOSE OF CONSTRUCTION MATERIAL ON
> HIGHWAY DUE TO
> UNCOMANDED TAILGATE OPENING.. TAILGATE
> COMES OPEN ON ITS OWN...THIS IS AFTER
> RECALL WAS COMPLETED. *TR[81]

175. On April 6, 2020, the owner of a 2017 Ford F-350 filed the following

complaint with NHTSA:

> I TOOK MY TRUCK IN FOR A NONRELATED
> REPAIR. WHEN I WAS THERE I WAS INFORMED
> THAT THERE WAS A SAFETY RECALL
> ON TAILGATE OPENING. I NEVER HAD A
> PROBLEM WITH IT OPENING BUT SINCE IT WAS
> ALREADY AT THE DEALERSHIP FOR OTHER
> REPAIRS, I OKAYED THE RECALL REPAIR ON
> THE TAILGATE OPENING ON ITS ON. NOW SINCE
> I HAVE HAD THE REPAIR DONE ON MY TRUCK
> THE TAILGATE OPENS ON ITS OWN NOW. I HAVE

---

[79] NHTSA ID 11330697.

[80] NHTSA ID 11330252.

[81] NHTSA ID 11328034.

TAKEN IT BACK SEVERAL TIMES FOR THE PROBLEM. BUT I HAVE BEEN TOLD THAT IF THEY CAN'T VERIFY THE PROBLEM THEY CAN'T FIX IT. BUT I CAN'T MAKE IT DO IT ON COMMAND. IT DOES IT ON ITS OWN ONCE EVERY 7 TO 14 DAYS. CAN I GET HELP ON GETTING THIS PROBLEM REPAIRED? MOST OF THE TIME WHEN THIS HAPPENS I GET INTO MY TRUCK, START IT AND GO TO BACK UP. I GET WARNING TONE AND NOTICE THAT THE TAILGATE IS DOWN. I'M WORRIED THAT I COULD BE PULLING A TRAILER WHEN THIS HAPPENS AND IT DAMAGES MY TAILGATE AND TRAILER.[82]

176. On January 22, 2021, the owner of a 2017 Ford F-450 filed the following complaint with NHTSA:

TL* THE CONTACT OWNS A 2017 FORD F-450. THE CONTACT STATED THAT WHILE DRIVING THERE WAS A LOUD CRUNCHING SOUND AND BECAME AWARE THAT THE TAILGATE HAD FALLEN ONTO THE TRAILER. THE VEHICLE WAS TAKEN TO SHAWNEE MISSION FORD (11501 SHAWNEE MISSION PKWY, SHAWNEE, KS 66203) WHERE THEY INFORMED THE CONTACT THAT A PREVIOUS RECALL REPAIR WAS PERFORMED CORRECTLY. THE VEHICLE WAS THEN TAKEN TO THOROUGHBRED FORD (8501 N. BOARDWALK AVE, KANSAS CITY, MO 64154) WHERE THE CONTACT WAS INFORMED THAT THE DENT WAS BEING REPAIRED AND THE PART WAS BEING REPAINTED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND PROVIDED THE CONTACT A CLAIM NUMBER. THE APPROXIMATE FAILURE MILEAGE WAS 69,000.[83]

---

[82] NHTSA ID 11320302.

[83] NHTSA ID 11389367.

177.   The inadequacy of Ford's Recall is further exacerbated by Ford's refusal to include later model year Class Vehicles that suffer from the same Tailgate Defect that gave rise to the Recall.  NHTSA's website includes numerous complaints detailing the existence of the Tailgate Defect in newer models of the Class Vehicles that are excluded from the Recall.

178.   For example, on January 25, 2021, the owner of a 2020 Ford F-250 filed the following complaint with NHTSA:

> THE ELECTRONIC TAILGATE HAS OPENED BY ITSELF TWICE. ONE IN A PARKING LOT (NOT MOVING) AND THE OTHER IN MY DRIVEWAY (NOT MOVING). THE ONLY COMMON THING IS THAT IT WAS RAINING BOTH TIMES.[84]

179.   On November 12, 2020, the owner of a 2020 Ford F-250 filed the following complaint with NHTSA:

> UNINTENDED TAILGATE OPENINGS   ;   GOING DOWN THE ROAD AT ABOUT 60 MILES PER HOUR THE TAILGATE CAME OPEN AND LOST SOME CARGO . THE VEHICLES BEHIND MINE HAD TO CHANGE LANES AS WELL AS GO OFF THE ROAD IN ORDER TO AVOID A COLLISION .THIS HAS HAPPENED OVER 11 TIMES . THREE TIMES THE VEHICLE WAS NOT MOVING , ALL OTHER TIMES THE VEHICLE WAS MOVING. FORD HAS TRIED TO TO REPAIR THE VEHICLE WITH NO SUCCESS . THIS VEHICLE HAS BEEN OUT OF SERVICE OVER 70 DAYS SINCE NEW . THE ENTIRE WIRING HARNESS HAS BEEN REPLACED , FORD PUT IN

---

[84] NHTSA ID 11389762.

THE IDENTICAL HARNESS WITH NO NEW IMPROVEMENTS . THE PROBLEM STILL EXISTS . FORD ALSO CLAIMS THEY DON'T HAVE ANY PROBLEMS WITH UNINTENDED TAILGATE OPENINGS .THIS A SERIOUS SAFETY HAZARD . THE VEHICLE WAS ON A MAJOR HIGHWAY WHEN THIS EVENT OCCURED .[85]

180. On September 22, 2020, the owner of a 2020 Ford F-250 filed the following complaint with NHTSA:

ON AUGUST 9, 2020 THE ELECTRIC AUTOMATIC TAILGATE OPENNING DEVICE MALFUNCTIONED WHILE I WAS DRIVING MY 2020 F-250 TOWING A FIFTH WHEEL TRAILER AT THE TIME. THE TAIL GATE OPENNED WHILE I WAS DRIVING THE TRUCK CAUSING EXTENSIVE DAMAGE TO MY TRAILER AND TRUCK TAIL GATE. WHILE I WAS DRING IN A NEIGHBORHOOD AT LESS THAN 15 MILES PER HOUR, WITH NO TRAFFIC, AND WAS ABLE TO PULL OVER SAFELY, I STILL HAD TO BLOCK TRAFFIC AND IF THIS MALFUNCTION OCCURRED UNDER DIFFERENT CIRCUMSTANCES FAR MORE SIGNIFICANT SAFETY IMPACT, INCLUDING INJURY AND POSSIBLE DEATH COULD HAVE OCCURRED. THE NHTSA HAS ISSUED PREVIOUS SAFETY RECALLS FOR FORD TRUCKS 2017-2019 FOR THE EXACT SAME ISSUE. WHILE FORD CONTENDS THEY HAVE FIXED THE PROBLEM IN THIER 2020 MODEL, THAT IS OBVIOUSLY NOT THE CASE AS THIS OCCURRED WHILE I WAS DRIVING THE VEHICLE WITH THE TAILGATE CLOSED/SECURED PRIOR TO THE VEHICLE MOVING. THIS IS A SERIOUS SAFETY ISSUE THAT MUST BE ADDRESSED. I HAVE

---

[85] MHTSA ID 11374295.

> REPORTED THIS TO FORD TWICE, THEIR CASE
> REFERENCE NUMBERS ARE PROVIDED HERE:
> CAS-27558976-X5L5C1 AND CAS-27335518. FORD
> HAS REFUSED TO ACCEPT RESPONSIBILITY OR
> TAKE CORRECTIVE ACTION.[86]

181.   On September 21, 2020, the owner of a 2020 Ford F-250 filed the

following complaint with NHTSA:

> BACKING UP IN REVERSE WITH A TRAILER.
> CLEAR SKIES, DRY WEATHER AND DURING
> DAYLIGHT. TAILGATE OPENS AND HITS THE
> TRAILER JACK CAUSING EXTENSIVE DAMAGE
> TO TAILGATE, TAILGATE RAIL, PULL OUT
> STEP.[87]

182.   On August 15, 2020, the owner of a 2020 Ford F-250 filed the following

complaint with NHTSA:

> TAILGATE OPENS WHILE TOWING A TRAILER[88]

183.   On August 15, 2020, the owner of a 2020 Ford F-250 filed the following

complaint with NHTSA:

> WHILE A TRAILER IS ATTACHED TO THE TRUCK,
> THE TAILGATE OPENS AUTOMATICALLY AND
> WITHOUT WARNING. THE PROBLEM DOES NOT
> OCCUR EVERY TIME BUT DOES OCCUR OFTEN
> WHILE TOWING. IT TYPICALLY OPENS WHEN
> FIRST STARTING TO MOVE, WHETHER FORWARD
> OR REVERSE. IT MAY OPEN REPEATEDLY AFTER

---

[86] NHTSA ID 11360411.

[87] NHTSA ID 11360169.

[88] NHTSA ID 11349578.

CLOSING AND ATTEMPTING TO START MOVING
AGAIN.[89]

184.  On September 4, 2020, the owner of a 2020 Ford F-350 filed the

following complaint with NHTSA:

> WHILE    TRAVELING    VEHICLE    IN    MOTION
> ELECTRIC TAILGATE SPONTANEOUSLY
> RELEASED DAMAGING THE TAILGATE AND TOW
> VEHICLE    ON    8/8/2020,    8/20/2020    AND
> 9/3/2020. TAILGATE RELEASED    ON    SEVERAL
> OCCASIONS WHILE TOWING ON CITY STREETS
> AND HIGHWAY.[90]

185.  On June 1, 2020, the owner of a 2020 Ford F-350 filed the following

complaint with NHTSA:

> TL* THE CONTACT OWNS A 2020 FORD F-350. THE
> CONTACT STATED THAT THE TAILGATE FAILED
> TO REMAIN LATCHED WHILE DRIVING. THE
> CONTACT STATED THAT THE TAILGATE OPENED
> INDEPENDENTLY THREE TIMES WHILE DRIVING.
> ON ONE OCCASION, THE TAIL GATE OPENED
> WHEN THE CONTACT WAS HAULING A TRAILER
> AND    DAMAGE    THE    TRAILER    CAMPER
> GENERATOR. RANDALL REED'S PLANET FORD
> (19000 EASTEX FREEWAY, HUMBLE, TEXAS 77338,
> (800)-850-8751), WAS UNABLE TO DUPLICATE THE
> FAILURE. THE VEHICLE WAS NOT REPAIRED.
> THE MANUFACTURER WAS CONTACTED. THE
> FAILURE MILEAGE WAS 1,500. *BF CONSUMER
> STATED REPAIR WAS DONE ON 2017-2019.*JB[91]

---

[89] NHTSA ID 11349576.

[90] NHTSA ID 11353197.

[91] NHTSA ID 11326756.

186.   On February 6, 2021, the owner of a 2021 Ford F-250 filed the following complaint with NHTSA:

> AUTOMATIC TAIL GATE OPENING WHILE
> DRIVING ON CITY STREET.[92]

187.   Separately, Ford failed to adequately notify the Class members that their vehicles were recalled.  For example, Ford never notified Plaintiff Tri-State Collision that its vehicle was subject to the Recall.

188.   Finally, Ford's Recall fails to reimburse Class members for out-of-pocket expenses incurred as a result of the Tailgate Defect.

189.   In sum, the Recall is deficient because Ford failed to adequately remedy the Tailgate Defect, it failed to include newer model year Class Vehicles in the Recall, it failed to adequately notify Class members of the Recall, and it failed to reimburse Class members for out-of-pocket expenses.

190.   Each time Ford denied a Class member an adequate warranty repair or an adequate Recall Tailgate Defect repair, it breached its Limited Warranty.

191.   Class Vehicles equipped with a defective tailgate system are unmerchantable and unfit for their ordinary purpose.  The Tailgate Defect renders the Class Vehicles unreasonably dangerous and place Class members and others on the road at increased risk of injury or death.

---

[92] NHTSA ID 11395326.

192.   Ford's failure to cure the Tailgate Defect substantially impairs the use, drivability, value, and safety of the Class Vehicles.

193.   Accordingly, all Class Vehicles are unmerchantable, unfit for their intended and ordinary purpose of transportation and towing and hauling heavy cargo and equipment, and are substantially less drivable, less safe, less useful, and less "capable" because of the unresolved Tailgate Defect.

### E.   Ford Omitted and Concealed the Tailgate Defect and Marketed the Class Vehicles as The Most Reliable Trucks For Towing and Hauling Heavy Cargo and Equipment

194.   Ford knowingly marketed and sold/leased the Class Vehicles with the Tailgate Defect, while willfully omitting and concealing the true inferior quality and substandard performance of the Class Vehicles' tailgate latch systems.

195.   Ford directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media, which impart a uniform and pervasive marketing message.

196.   Ford markets the F-250, F-350, and F-450 vehicles universally as "Super Duty" trucks.[93]   The entirety of Ford's marketing materials regarding the "Super Duty" line applies to all Class Vehicles.

---

[93]   *See* Exhibit G, https://static.fzinternal.com/dealers/2017-superduty.pdf (last visited February 18, 2021) at P.2.

197.   Ford markets the Class Vehicles as the "toughest," and "most capable" trucks for towing and hauling heavy cargo and equipment.

198.   For example, in the sales brochure for the 2017 Super Duty, Ford stated it "tortured" the Class Vehicles in pre-release testing.   Ford stated it exposed the Class Vehicles to extreme conditions with extreme payloads and that "[t]his all-new 2017 Super Duty is engineered for extremes."[94]



199.   Ford's marketing pictured a Class Vehicle towing a heavy trailer and stated that "[i]f you need to tow more than any other truck in the class, you'll be in

---

[94] *Id.*

a Super Duty.  It's optimized for heavy hauling. So you can pull the most weight – confidently."[95]



200.   Ford not only touts the Class Vehicle's ability to tow, but it also touts the ability to haul heavy cargo in the truck bed: "After surviving countless hours of abuse at the hands of Ford engineers, this high-strength, military-grade, aluminum alloy cargo box is reporting for duty. Super Duty. Best-in-class payload sits inside these walls. . . . Load up.  Head out."[96]

---

[95] *Id.*

[96] *Id.*



201. In addition, in an advertisement with the heading "So Capable It Delivers All This," Ford specifically touts the Class Vehicles' "remote tailgate lock and release," while failing to disclose that the tailgate can open suddenly and unintentionally:[97]

---

[97] *Id.*



202. Ford also stated that the tailgate will "gradually" open "[w]hen activated," but its failed to disclose the Tailgate Defect:[98]

---

[98] *Id.*



203.   Despite Ford marketing the 2017 Class Vehicles as the toughest, most capable towing trucks on the market, Ford failed to disclose, and actively conceals, the Tailgate Defect.

204.   Ford marketed the later model years similarly.  For example, in its sales brochures for the model year 2018 Class Vehicles, Ford pictured a Class Vehicle pulling a heavy camper and stated that the Class Vehicles are "America's best-selling truck for 41 years, Ford F-Series is engineered to help you get the job done

when no one else can. Nowhere is that better exemplified than here. In the legendary

work ethic of Super Duty. F-250. F-350. F-450. Rock solid. Reporting for duty."[99]



---

[99]     Exhibit     H,     https://cdn.dealereprocess.org/cdn/brochures/ford/2018-
f250superduty.pdf (last visited February 18, 2021).



205.   Like the model year 2017, Ford stated it "tortured" the Class Vehicles in pre-release testing and to "[r]est assured, it's Built Ford Tough.  In every way that matters."[100]

---

[100] *Id.*



206.   Ford also pictured the 2018 Class Vehicles pulling heavy cargo and stated it is "optimized for heavy hauling.  Helping you pull the most weight – and doing it with confidence."[101]

---

[101] *Id.*



207.   For also touted the ability to haul heavy cargo in the truck bed: "So load up. And head out."[102]

---

[102] *Id.*



208.    Ford specifically advertised the electric tailgate latch release switch, but again failed to disclose the Tailgate Defect.[103]

---

[103] *Id.*



209.   In the sales brochure for the model year 2019 Class Vehicles, Ford marketed the Class Vehicle's ability to haul heavy cargo in the truck bed:[104]

---

[104]    Exhibit   I,   https://cdn.dealereprocess.org/cdn/brochures/ford/2019-f350superduty.pdf (last viewed February 18, 2021).



Imagine how much an F-Series Super Duty will haul over its lifetime. Stumps. Brush. Fence posts. Cinder blocks. Hay bales. Aggregate. Tools. Generators. Landscaping materials. Pea gravel. 5th-wheel/gooseneck trailers. This cargo box is engineered with extreme capability in mind.

It's the first and only one in its class made from high-strength, military-grade, aluminum alloys.¹ Dent-and-ding resistance inside: better than steel. Susceptibility to red rust: gone. The only thing more special is this: best-in-class max. payload can sit inside these walls.

210.   Like the previous model years, Ford stated that it "tortured" the Class

Vehicles in its pre-release testing and that "you can be confident that Super Duty is

engineered to handle your toughest jobs. And more."[105]

---

[105] *Id.*



211.   Ford stated that the "Super Duty Brings Confidence in Tow."[106]



---

[106] *Id.*

212.   Ford again specifically advertised the electric tailgate release switch, but did not disclose the Tailgate Defect:[107]



213.   The front cover of the sales brochure for the model year 2020 Class Vehicles pictured a Class Vehicle towing a heavy trailer and tractor:[108]

---

[107] *Id*.

[108] Exhibit J, https://cdn.dealereprocess.org/cdn/brochures/ford/2020-superduty.pdf (last visited February 18, 2021).



214.   Ford also pictured a Class Vehicle towing a heavy logging trailer and stated that it is "Rock Solid. Always Ready for Duty."[109]

---

[109] *Id.*



215.   Ford ran television commercials advertising the Class Vehicles.  For example, in one commercial for the model year 2018 Class Vehicles, Ford shows many Super Duty trucks towing trailers with various heavy payloads to the tune of "Eastbound and Down" by Jerry Reed.[110]

216.   In a television commercial for the 2017 Class Vehicles, Ford demonstrated the Class Vehicles hauling and towing various loads and stated "it is time to punch work in the face.  This is the next level.  This is the Ford Super Duty."[111]

---

[110]  https://www.youtube.com/watch?v=8X0POslf1-0  (last visited February 18, 2021).

[111]  https://www.ispot.tv/ad/AuMp/2017-ford-super-duty-punch-work-in-the-face (last visited February 18, 2021).

217.    In a television commercial for the 2020 Class Vehicles, Ford demonstrated the Class Vehicles hauling and towing various heavy loads and stated it is "The Most Capable Heavy Duty Pickup Trick Ever Built."[112]

218.    The above examples are a representative sampling of Ford's marketing of the Class Vehicles.

219.    Ford not only marketed the Class Vehicles as the toughest and most capable trucks for hauling and towing heavy cargo and equipment; Ford has been pervasively branding its Super Duty trucks the same for years.

220.    For example, in the sales brochure for the 2010 Super Duty trucks, Ford pictured a Super Duty towing a trailer with a large tractor, stating the Super Duty is "The Most Capable Pickup Truck in North America," and is the "Best-in-class [for] towing."[113]

---

[112] https://www.youtube.com/watch?v=mKKBngqBIbM (last visited February 18, 2021).

[113] Exhibit K, https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2010.pdf (last visited February 19, 2021).



221.   Ford similarly branded the 2012, 2014, and 2016 Super Duty trucks as

tough and capable of towing and hauling heavy cargo and equipment:[114]

---

[114] Exhibit L, **2012:** https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2012.pdf (last visited February 19, 2021); Exhibit M, **2014:** https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2014.pdf (last visited February 19, 2021); Exhibit N, **2016:** https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2016.pdf (last visited February 19, 2021).



# OUTWORKS ALL THE REST.

This truck endured more torture testing than any generation of Ford Truck before it – including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever. A world-class team put this Super Duty® through a groundbreaking battery of computer simulations, lab and real-world tests – running it for thousands of hours on end in extreme conditions. Scorching heat. Bitter cold. Loaded to the max. Up the steepest grades. All to confirm that this truck is far more than the sum of its parts.

Super Duty is built to be the best – bringing you the best diesel and gas fuel economy of any truck in its class[1] – plus lots of other capabilities and features only Ford can deliver.

**Best in Class**

- Fuel Economy: Diesel and Gas
- Max. Horsepower and Torque: Diesel and Gas
- Max. Conventional Towing: 17,500 lbs.[2]
- Max. 5th-Wheel Towing: 24,500 lbs.[2]
- Max. Payload: 7,110 lbs.[2]

**Class Exclusives**

- Live-Drive Power TakeOff (PTO)[3]
- 5th-Wheel/Gooseneck Trailer Tow Prep Package[3]
- Standard Trailer Sway Control on both SRW and DRW
- LCD Productivity Screen[3]
- Standard Safety Canopy® System
- Tailgate Step[3]



## TRUSTED BY THOSE WHO OWN WORK.

Construction. Heavy Hauling. Emergency Vehicles. Agriculture. Forestry. Utility Services. Within these and countless other essential industries, the guys who do the toughest work count on one heavy-duty truck more than any other[1] — Ford Super Duty.® Day in. And day out. Built Ford Tough® powertrains deliver best-in-class[2] gas horsepower and torque. Plus, the 2014 Super Duty pickup with Power Stroke® 6.7L diesel achieves best-in-class diesel fuel economy,[3] horsepower, and standard torque. Backed by best-in-class maximum payload and conventional towing capabilities[4] and standard trailer sway control, Super Duty helps you get the job done when no one else can. No wonder F-Series has been America's best-selling truck for 36 years. Go further in a 2014 Super Duty.



## MANAGE YOUR PAYLOADS WITH EASE.

With its range of maximum payload capabilities, plus all the right tools for loading, accessing and managing your cargo, Super Duty is built to help you work smarter.

**Walk up into the bed** with our class-exclusive tailgate step.[1] Just open the tailgate, drop the skid-resistant step down, flip the grab bar up and go.

**To help increase your confidence** while hauling heavy loads, Super Duty features AdvanceTrac® with RSC® (Roll Stability Control™). It utilizes 2 gyroscopic sensors to automatically help you avoid skidding and fishtailing, and help you keep all 4 wheels firmly planted.[2] You'll find it particularly beneficial in inclement weather.

222.   Ford pervasively branded Class Vehicles, and its Super Duty line in general, as robust and reliable, intended for towing and carrying heavy cargo and equipment.   Ford also explicitly marketed the electronic tailgate release switch. However, Ford never disclosed, and actively conceals, the Tailgate Defect.

223.   In practice, the Class Vehicles are not as robust and capable as Ford represents.  Ford omitted and concealed the fact that the tailgate would suddenly and unexpectedly open, damaging the tailgate and trailer, reducing the clearance between the truck and trailer (thereby affecting operability), and releasing cargo into traffic.

224.   Plaintiffs and the other Class members were exposed to Ford's long-term, national, multimedia marketing campaign touting the supposed quality and reliability of the Class Vehicles, and Plaintiff and the other Class members justifiably made their decisions to purchase or lease their Class Vehicles based on Ford's misleading marketing that omitted and concealed the true, defective nature of the Class Vehicles.

225.   Further, Ford knowingly misled Class members about the true, defective nature of the Class Vehicles.  As detailed above, upon information and belief, Ford has been aware of the Tailgate Defect since at least 2016, and certainly well before Plaintiffs and the other Class members purchased or leased their Class Vehicles, through pre-release evaluation and testing; the high number of tailgate

latch system repairs and replacement part sales; and the numerous and consistent complaints about the Tailgate Defect collected by NHTSA.

226.   Ford has actively concealed the existence and nature of the Tailgate Defect from Class members since at least 2016 despite its knowledge of the existence and pervasiveness of the Tailgate Defect.  Specifically, Ford has:

a.   Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Tailgate Defect;

b.   Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' tailgate latch systems were defective and not fit for their intended purposes;

c.   Failed to disclose, and actively concealed, the fact that the Class Vehicles' tailgate latch systems were defective, despite that Ford learned of the Tailgate Defect as early as 2016, and certainly well before Plaintiffs and Class members purchased or leased their Class Vehicles; and

d.   Failed to disclose, and actively concealed, the existence and pervasiveness of the Tailgate Defect even when directly asked about it by Class members during communications with Ford, Ford dealerships, and Ford service centers.

227.   By engaging in the conduct described above, Ford has concealed, and continues to conceal, the Tailgate Defect from Plaintiffs and the other Class members.  If Plaintiffs and the other Class members had known of the information Ford concealed, they would not have purchased or leased the Class Vehicles or would have paid less to do so.

### F.   **Applicable Warranties**

228.   Ford sold and leased the Class Vehicles with a written express warranty covering the Class Vehicles for three years or 36,000 miles, whichever comes first.

229.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

230.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

231.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods."

232. Ford provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

233. There is also an implied warranty of merchantability, warranting that each Class Vehicle that is sold or leased is fit for its ordinary purpose.

### G.   **Pre-Suit Notice**

234. Ford had notice of the Tailgate Defect based on its actual and exclusive knowledge, as alleged herein.

235. Plaintiff Tri-State Collision, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its deceptive practice and breach of warranties, through a notice letter delivered by courier on February 8, 2021 to Ford's registered agent in Montgomery, Alabama. Ford acknowledged receipt through a response e-mail from its counsel dated February 15, 2021.

236. Plaintiff Cunningham, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its deceptive practice and breach of warranties, through a notice letter deliver by courier on February 16, 2021 to Ford's registered agent in Montgomery, Alabama. Ford acknowledged receipt through a response e-mail from its counsel dated February 23, 2021.

237. Moreover, Ford's failure to adequately remedy the Tailgate Defect makes any notice requirement futile.

**H.   Fraudulent Omission and Concealment Allegations**

238. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Ford responsible for making false and misleading statements regarding the Class Vehicles. Ford necessarily is in possession of all of this information. Plaintiffs' claims arise out of Ford's fraudulent omission/concealment of the Tailgate Defect, despite it representations about the Class Vehicles.

239. Plaintiffs allege that at all relevant times, including specifically at the time they and Class members purchased or leased their Class Vehicle, Ford knew, or was reckless in not knowing, of the Tailgate Defect; Ford had a duty to disclose the Tailgate Defect based upon its extensive and exclusive knowledge; and Ford never disclosed the Tailgate Defect to Plaintiffs or the public at any time or place in any manner other than a halfhearted, inadequate Recall.

**I.   Tolling**

240. Beginning in 2017, Ford continuously marketed and sold the Class Vehicles equipped with the defective tailgate systems to unsuspecting customers. Ford continuously represented the Class Vehicles as safe and dependable despite the propensity for the tailgate to fail under normal operating conditions. By making

these false representations, and failing to disclose the existence of the Tailgate Defect in the Class Vehicles and thereby exposing occupants to risk of injury and death, Ford engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that they might seek to apply.

241.   Pursuant to the TREAD Act, 49 U.S.C. § 30118, manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects.  Ford owed a continuing duty to Plaintiffs and the other Class members to disclose any risks to life and limb that its products pose. It continually breached that duty.

242.   Ford breached its duties to consumers by knowingly selling Class Vehicles with the defective tailgate systems on an ongoing basis.

243.   Ford's knowledge of the Tailgate Defect is evidenced by numerous NHTSA complaints by consumers, many of whom reported contacting Ford directly about the defective tailgate systems.  Other NHTSA complainants reported taking their vehicles to Ford's dealers, who are agents of Ford and, on information and belief, report consumer complaints back to Ford.

244.   Thus, Ford had continuing knowledge of the Tailgate Defect and the dangers it posed, yet continued to market, sell and lease the Class Vehicles equipped

with the defective tailgate systems. Plaintiff's and other Class members' claims are not time barred.

245.   Ford had a duty to disclose to Plaintiffs and the other Class members the true quality and nature of the Class Vehicles, that the Class Vehicles had uniform defect; and that the Tailgate Defect requires repairs, poses a safety risk, and reduces the intrinsic and resale value of the affected vehicles.

246.   This duty arose, inter alia, under the TREAD Act, 49 U.S.C. § 30118.

247.   Ford knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Tailgate Defect, as alleged herein.

248.   Ford concealed and omitted to disclose the Tailgate Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

249.   Despite Ford's knowledge of the Tailgate Defect, it failed to disclose and concealed this material information from Plaintiffs and the other Class members, and instead continued to market the Class Vehicles as safe and durable.

250.   The purpose of Ford's concealment of the Tailgate Defect was to prevent Plaintiffs and the other Class members from seeking redress.

251.   Plaintiffs and the other Class members justifiably relied on Ford to disclose the existence of dangerous defects, including the Tailgate Defect, in the

Class Vehicles that they purchased or leased, because that defect was not discoverable by Plaintiffs and the other Class members through reasonable efforts.

252. Any applicable statute of limitations has been tolled by virtue of Ford's knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

253. Even through the exercise of reasonable diligence, Plaintiffs and the other Class members could not have discovered, prior to Ford's issuance of the Recall, that Ford was concealing and misrepresenting the existence of the Tailgate Defect in the Class Vehicles and the risks it posed.

254. Plaintiffs and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Ford failed to disclose material information within its knowledge about a dangerous defect to consumers worldwide.

## CLASS ACTION ALLEGATIONS

255. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

256. Plaintiffs seeks to represent a Nationwide Class ("Nationwide Class") defined as:

> All current and former owners or lessees of a Class
> Vehicle (as defined herein) that was purchased or leased

> in the fifty States, the District of Columbia, Puerto Rico,
> and all other United States territories and/or possessions.

257.   In addition, and in the alternative to the above, Plaintiff, Tri State

Collision, LLC, also seeks to represent an Alabama statewide class ("Alabama

Class"), defined as follows:

> All current and former owners or lessees of a Class
> Vehicle (as defined herein) that was purchased or leased
> in the State of Alabama.

258.   In addition, and in the alternative to the above, Plaintiff, William

Cunningham, also seeks to represent a Georgia statewide class ("Georgia Class"),

defined as follows:

> All current and former owners or lessees of a Class
> Vehicle (as defined herein) that was purchased or leased
> in the State of Georgia.

259.   Excluded from the Nationwide Class, the Alabama Class, and the

Georgia Class (together, the "Classes") are Ford and any of its members, affiliates,

parents, subsidiaries, officers, directors, employees, successors, or assigns; the

judicial officers, and their immediate family members; and Court staff assigned to

this case.  Plaintiffs reserve the right to modify or amend definitions of the Classes,

and to add additional classes and sub-classes, as appropriate, during the course of

this litigation.

260.   This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

261.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**   The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable.   While Plaintiffs are informed and believe that there are at least 300,000 Class members, the precise number of Class Vehicles is unknown to Plaintiffs, but may be ascertained from Ford's books and records.   Nationwide and Statewide Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

262.   **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**   This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a.   whether Ford engaged in the conduct alleged herein;

b.   whether Ford's alleged conduct violates applicable law;

c.      whether Ford designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles and/or the defective tailgate systems into the stream of commerce in the United States;

d.      whether Ford made false or misleading statements about the quality, safety and characteristics of the Class Vehicles and/or the defective tailgate systems;

e.      whether the Class Vehicles contain the Tailgate Defect;

f.      whether Ford had actual or implied knowledge of the Tailgate Defect;

g.      whether Ford failed to disclose Tailgate Defect to Plaintiffs and the other members of the Classes;

h.      whether Ford's omissions and concealment regarding the quality, safety and characteristics of the Class Vehicles and/or the defective tailgate systems were likely to deceive the members of Statewide Class in violation of the state consumer protection statutes alleged herein;

i.      whether Ford breached its express warranties with respect to the Class Vehicles;

j.      whether Ford breached its implied warranties with respect to the Class Vehicles;

k.     whether the members of the Classes overpaid for their Class Vehicles;

l.     whether the members of the Classes are entitled to damages, restitution, disgorgement, statutory damages, exemplary damages, equitable relief, and/or other relief; and

m.     the amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

263.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Classes because Plaintiffs and the members of the Classes purchased or leased Class Vehicles that contain defective tailgate systems, as described herein.  Neither Plaintiffs nor the other members of the Classes would have purchased or leased the Class Vehicles, or would have paid as much as they did for the Class Vehicles, had they known of the Tailgate Defect.  Plaintiffs and the other members of the Classes suffered damages as a direct and proximate result of the same wrongful practices in which Ford engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

264.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes that they seek to

represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

265.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

266.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the other members of the Classes to individually seek redress for Ford's wrongful conduct.  Even if these Class members could afford individual litigation, the court system could not.  Individual litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action

device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

**A.    Nationwide Class**

## COUNT 1
### VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, *et seq.*
(Individually and on Behalf of the Nationwide Class)

267.    Plaintiffs Tri State Collision, LLC and William Cunningham ("Plaintiffs" for purposes of this Count), incorporate by reference each allegation in paragraphs 1-266 as if set forth fully herein.

268.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class ("Class" for purposes of this Count).

269.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

270.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

271.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

272.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

273. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

274. In its express written warranties, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

275. Ford's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

276. With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's written warranties and implied warranty became part of the basis of the bargain between Ford and Plaintiffs and other Class members.

277. Ford breached the implied warranty of merchantability. Without limitation, the Class Vehicles have tailgate systems that suddenly and unintentionally open, as described above, which renders the Class Vehicles unmerchantable.

278. Ford breached its express warranties by not offering a functioning repair for the defective tailgate system in the Class Vehicles as alleged herein.

279. Plaintiffs, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter delivered to Ford's registered agent in

Montgomery, Alabama on February 8, 2021 and February 16, 2021, respectively. Ford acknowledged receipt on February 15, 2021 and February 23, 2021, respectively. Ford also had actual knowledge of the Tailgate Defect, as alleged herein.  Further, Ford has refused to provide an adequate warranty repair for the Tailgate Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to tailgate system failure have been denied adequate repair.

280.   At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Tailgate Defect.

281.   The amount in controversy of each Plaintiffs' individual claim exceeds the sum of $25.  The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

282.   Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT 2
## FRAUDULENT OMISSION
(Individually and on behalf of the Nationwide Class)

283.   Plaintiffs  Tri-State  Collision  and  Cunningham  ("Plaintiffs," for purposes of the Nationwide Class' claims) incorporate by reference each allegation in paragraphs 1-266 as if fully set forth herein.

284.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

285.   Ford was aware of the Tailgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

286.   Having been aware of the Tailgate Defect within the Class Vehicles, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know of the Tailgate Defect, Ford had a duty to disclose the defect to Plaintiffs and the other members of the Class in connection with the sale or lease of the Class Vehicles.

287.   Ford did not disclose the Tailgate Defect to Plaintiffs and the other members of the Class in connection with the sale of the Class Vehicles.

288.   For the reasons set forth above, the Tailgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

289.   In purchasing the Class Vehicles, Plaintiffs and the other members of the Class reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.

290.   Had Plaintiffs and the other members of the Class known of the Tailgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

291.   Through its omissions regarding the Tailgate Defect within the Class Vehicles, Ford intended to induce, and did induce, Plaintiffs and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

292.   As a direct and proximate result of Ford's omissions, Plaintiffs and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Tailgate Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 3
### BREACH OF EXPRESS WARRANTY, U.C.C. §§ 2-313 and 2A-210
(Individually and on behalf of the Nationwide Class)

293.   Plaintiffs Tri-State Collision and Cunningham ("Plaintiffs," for purposes of the Nationwide Class' claims) incorporate by reference each allegation in paragraphs 1-266 as if fully set forth herein.

294.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

295.   Ford is and was at all relevant times a merchant and seller of the Class Vehicles.

296.   Ford is obligated to conform the Class Vehicles to its express warranties.

297.   In its written express warranties, Ford expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

298.   Ford's written express warranties formed the basis of the bargain that was reached when Plaintiffs and the other Class Members purchased or leased their Class Vehicles.

299.   Ford breached its express warranty to repair defective parts in the Class Vehicles. Ford admittedly has not repaired the Class Vehicles' Tailgate Defect.

300.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Ford has failed and/or has refused to adequately provide effective remedies within a reasonable time.

301.   Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

302.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Ford Vehicles under false pretenses.

303.   Ford had notice of its breach as alleged herein.

304.   As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 4
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### U.C.C. §§ 2-314 and 2A-212
(Individually and on behalf of the Nationwide Class)

305.   Plaintiffs Tri-State Collision and Cunningham ("Plaintiffs," for purposes of the Nationwide Class' claims) incorporate by reference each allegation in paragraphs 1-266 as if fully set forth herein.

306.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

307.   Ford is and was at all relevant times a merchant and seller of the Class Vehicles.

308.   A warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

309.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Tailgate Defect which causes the tailgate systems in Class Vehicles to suddenly and unintentionally open.

310.   Ford had notice of its breach as alleged herein.

311.   Plaintiffs and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Ford's breach of the warranty of merchantability.

312.   As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 5
## UNJUST ENRICHMENT
(Individually and on behalf of the Nationwide Class)

313.    Plaintiffs Tri-State Collision and Cunningham ("Plaintiffs," for purposes of the Nationwide Class' claims) incorporate by reference each allegation in paragraphs 1-266 as if fully set forth herein.

314.    Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

315.    Ford has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Ford's concealment of the Tailgate Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

316.    Ford has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

317.    It is inequitable and unconscionable for Ford to retain these benefits.

318.    Because Ford concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Ford's misconduct.

319.    Ford knowingly accepted the unjust benefits of its wrongful conduct.

320.   As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**B.     Alabama Class**

**COUNT 6**
**VIOLATIONS OF ALABAMA'S DECEPTIVE TRADE PRACTICES ACT**
**ALA. CODE §§ 8-19-1, *ET SEQ.***
(Individually and on behalf of the Alabama Class)

321.   Plaintiff Tri State Collision, LLC ("Plaintiff" for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

322.   Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

323.   The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

324.   By the conduct described in detail above and incorporated herein, Ford engaged in deceptive trade practices.

325.   Plaintiff, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its violation of the Alabama Deceptive Trade Practices Act, through a notice letter hand-delivered to Ford's registered agent in Montgomery, Alabama on February 8, 2021, which Ford

109

acknowledged on February 15, 2021. Ford also had actual knowledge of the Tailgate Defect, as alleged herein. Moreover, due to Ford's inability to remedy the Tailgate Defect, any notice requirement is futile.

326. Ford's misrepresentations, omissions, and deceptive trade practices regarding the Tailgate Defect, described above, which causes the tailgate system to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

327. Ford intended for Plaintiff and the other Class members to rely on the misrepresentations, omissions, and deceptive trade practices regarding the Tailgate Defect.

328. Plaintiff and the other Class members justifiably acted or relied to their detriment upon Ford's misrepresentations, omissions, and deceptive trade practices concerning the above-described Tailgate Defect, as evidenced by Plaintiff's and the other Class members' purchases of Class Vehicles.

329. Had Ford represented the material information accurately, disclosed all material information, and/or not engaged in deceptive trade practices regarding the Tailgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

330.   Ford's misrepresentations, omissions, and deceptive trade practices have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

331.   Moreover, Ford's failure to adequately remedy the Tailgate Defect is false, unfair, deceptive, and unconscionable.  Despite knowing its Recall repair is inadequate, Ford continued to implement the Recall repair which causes consumers to believe that their vehicles are adequately repaired in a safe condition.

332.   Moreover, Ford's failure to recall other Class Vehicles despite knowing they suffer from the Tailgate Defect is false, unfair, deceptive, and unconscionable.

333.   As a direct and proximate result of Ford's deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Tailgate Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, *et seq.*

## **COUNT 7**
## **BREACH OF EXPRESS WARRANTY**
## **ALA. CODE §§ 7-2-313 AND 7-2A-210**
### (Individually and on behalf of the Alabama Class)

334.    Plaintiff Tri State Collision, LLC, ("Plaintiff" for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

335.    Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class" for purposes of this Count).

336.    Ford is a merchant with respect to the Class Vehicles.

337.    In its written express warranty, Ford expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

338.    Ford's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

339.    Ford breached its express warranty to repair defective parts in the Class Vehicles. Ford admittedly has not repaired the Class Vehicles' Tailgate Defect.

340.    Plaintiff, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter hand delivered to Ford's registered agent in Montgomery, Alabama on February 8, 2021, which Ford acknowledged on

February 15, 2021.  Ford also had actual knowledge of Tailgate Defect as alleged herein.  Moreover, Ford's failure to adequately remedy the Tailgate Defect renders any notice requirement futile.

341.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Ford has failed and/or has refused to adequately provide effective remedies within a reasonable time.

342.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

343.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Ford Vehicles under false pretenses.

344.   As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 8
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## ALA. CODE §§ 7-2-314 AND 7-2A-314
(Individually and on behalf of the the Alabama Class)

345.   Plaintiff Tri State Collision, LLC, ("Plaintiff" for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

346.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

347.   Ford is a merchant with respect to motor vehicles under Ala. Code § § 7-2-104 and 7-2A-103.

348.   Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

349.   The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which they are used.  Specifically, the Class Vehicles suffer from the Tailgate Defect which causes the tailgate systems in Class Vehicles to suddenly and unintentionally open.

350.   Plaintiff, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its corresponding

breach of warranty, through a notice letter hand delivered to Ford's registered agent in Montgomery, Alabama on February 8, 2021, which Ford acknowledged on February 15, 2021. Ford also had actual knowledge of the Tailgate Defect, as alleged herein. Further, Ford has refused to provide an adequate warranty repair for the Tailgate Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to tailgate system failure have been denied adequate repair.

351. Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Ford's breach of the warranty of merchantability.

352. As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 9
## FRAUDULENT OMISSION
(Individually and on behalf of the Alabama Class)

353. Plaintiff Tri State Collision, LLC, ("Plaintiff" for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

354. Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

115

355.   Ford was aware of the Tailgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

356.   Having been aware of the Tailgate Defect within the Class Vehicles and having known that Plaintiff and the other Class members could not have reasonably been expected to know of the Tailgate Defect, Ford had a duty to disclose the defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

357.   Ford did not disclose the Tailgate Defect to Plaintiff and the other Class members in connection with the sale of the Class Vehicles.

358.   For the reasons set forth above, the Tailgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

359.   In purchasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.

360.   Had Plaintiff and the other Class members known of the Tailgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

361.   Through its omissions regarding the Tailgate Defect within the Class Vehicles, Ford intended to induce, and did induce, Plaintiff and the other Class

members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

362.   As a direct and proximate result of Ford's omissions, Plaintiff and the other Class members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Tailgate Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 10
## UNJUST ENRICHMENT
(Individually and on behalf of the Alabama Class)

363.   Plaintiff Tri State Collision, LLC, ("Plaintiff" for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

364.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

365.   Because of its wrongful acts and omissions, Ford charged a higher price for the Class Vehicles than the Class Vehicles' true value and Ford obtained money which rightfully belongs to Plaintiff and the other Class members.

366.   Plaintiff and the other Class members conferred a benefit on Ford by purchasing or leasing the Class Vehicles.

367.   Ford had knowledge that this benefit was conferred upon them.

368.   Ford has been unjustly enriched at the expense of Plaintiff and each of the other Class members, and its retention of this benefit under the circumstances would be inequitable.

369.   Plaintiff seeks an order requiring Ford to make restitution to it and the other Class members.

C.   **Georgia Class**

**COUNT 11**
**VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**GA. STAT. ANN. §§ 10-1-390, *et seq.***
(Individually and on behalf of the Georgia Class)

370.   Plaintiff Cunningham ("Plaintiff," for purposes of the Georgia Class' claims) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

371.   Plaintiff brings this claim individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

372.   The Georgia Fair Business Practices Act, Ga. Stat. Ann. § 10-1-393, states that, "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful."

373.   By the conduct described in detail above and incorporated herein, Ford engaged in deceptive trade practices.

374. Plaintiff notified Ford of the Tailgate Defect in the Class Vehicles, and its deceptive practices, through a notice letter delivered by courier on February 16, 2021 to Ford's registered agent in Montgomery, Alabama. Ford acknowledged receipt through a response letter from its counsel dated February 23, 2021. Ford was also provided notice of the Tailgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

375. Ford's omissions regarding the Tailgate Defect, described above, which causes the tailgate systems in Class Vehicles to suddenly and unintentionally open, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

376. Ford intended for Plaintiff and the other Class members to rely on Ford's omissions regarding the Tailgate Defect.

377. Plaintiff and the other Class members justifiably acted or relied to their detriment upon Ford's omissions of fact concerning the above-described Tailgate Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

378. Had Ford disclosed all material information regarding the Tailgate Defect to Plaintiff and the other Class members, Plaintiff and the other Class

members would not have purchased or leased Class Vehicles or would have paid less to do so.

379.   Ford's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

380.   Moreover, Ford's failure to adequately remedy the Tailgate Defect is false, unfair, deceptive, and unconscionable.  Despite knowing its Recall repair is inadequate, Ford continued to implement the Recall repair which causes consumers to believe that their vehicles are adequately repaired in a safe condition.

381.   Ford's failure to recall other Class Vehicles despite knowing they suffer from the Tailgate Defect is false, unfair, deceptive, and unconscionable.

382.   As a direct and proximate result of Ford's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Tailgate Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ga. Stat. Ann. § 10-1-399.

**COUNT 12**
**VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE**
**PRACTICES ACT, GA. CODE ANN. § 10-1-370 *et seq*.**
(Individually and on behalf of the Georgia Class)

383.   Plaintiff Cunningham ("Plaintiff," for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

384.   This Count is brought on behalf of Plaintiff and the Georgia Class ("Class" for the purposes of this Count) for violation of Georgia's Uniform Deceptive Trade Practices Act (UDPTA), Ga. Code Ann. § 10-1-370 et. seq.

385.   The UDPTA prohibits deceptive acts or practices in the conduct of any business, trade or commerce in Georgia.

386.   Deceptive trade practices include, *inter alia*, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another"; "[a]dvertising goods or services with intent not to sell them as advertised"; and [e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding." Ga. Code Ann. § 10-1-393(b).

387.   Ford is a "person" within the meaning of 10-1-371(5).

388.   By the conduct described herein, Ford engaged in deceptive acts or practices in business, trade, or commerce.

121

389.   Ford's omissions regarding the Tailgate Defect, descried above, are material facts that a reasonable consumer would have considered in deciding to purchase (or not) the Class Vehicles.

390.   Ford intended for Plaintiff and the other Class members to rely on Ford's omissions regarding the Tailgate Defect.

391.   Had Ford disclosed the Tailgate Defect, Plaintiff and the other Class members would not have purchased their Class Vehicles or would have paid less for them.

392.   Plaintiff and the other Class members have been damaged as a direct and proximate result of Ford's actions.

393.   Plaintiff seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT 13
## BREACH OF EXPRESS WARRANTY
## GA. CODE ANN. §§ 11-2-313 and 11-2A-210
(Individually and on behalf of the Georgia Class)

394.   Plaintiff Cunningham, ("Plaintiff" for purposes of this Count) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

395.   Plaintiff brings this claim individually and on behalf of the other members of the Georgia Class (the "Class" for purposes of this Count).

122

396.   Ford is and was at all relevant times a merchant with respect to the Class Vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(d), and "sellers" of the Class Vehicles under § 11-2-103(1)(d).

397.   Pursuant to Ga. Code Ann. § 11-2-313(a), Ford had obligations to conform the Class Vehicles to the express warranties.

398.   In its written express warranties, Ford expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

399.   Ford's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

400.   Ford breached its express warranty to repair defective parts in the Class Vehicles. Ford admittedly has not repaired the Class Vehicles' Tailgate Defect.

401.   Plaintiff, individually and on behalf of the other Class members, notified Ford of the Tailgate Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter hand delivered to Ford's registered agent in Montgomery, Alabama on February 16, 2021, which Ford acknowledged on February 23, 2021. Ford was also provided notice of the Tailgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Ford has not remedied its breach.

402.   Further, Ford has refused to provide an adequate warranty repair for the Tailgate Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to tailgate system failure have been denied adequate repairs.

403.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Ford has failed and/or has refused to adequately provide effective remedies within a reasonable time.

404.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

405.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Ford Vehicles under false pretenses.

406.   As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 14
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Ga. Stat. Ann. §§ 84-2-314 and 84-2A-212
(Individually and on behalf of the Georgia Class)

407.   Plaintiff Cunningham ("Plaintiff," for purposes of the Georgia Class's claims) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

408.   Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

409.   Ford is and was at all relevant times a merchant with respect to motor vehicles under Ga. Stat. Ann. §§ 11-2-104 and 11-2A-103.

410.   Pursuant to Ga. Stat. Ann. §§ 11-2-314 and 84-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

411.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Tailgate Defect which causes the tailgate systems in Class Vehicles to suddenly and unintentionally open.

412.   Plaintiff notified Ford of the Tailgate Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter delivered by courier on

February 16, 2021 to Ford's registered agent in Montgomery, Alabama. Ford acknowledged receipt through a response letter from its counsel dated February 23, 2021. Ford was also provided notice of the Tailgate Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Ford has not remedied its breach.

413. Further, Ford has refused to provide an adequate warranty repair for the Tailgate Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Tailgate System failure have been denied adequate repair.

414. Plaintiffs and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Ford's breach of the warranty of merchantability.

415. As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 15
## FRAUDULENT OMISSION
(Individually and on behalf of the Georgia Class)

416. Plaintiff Cunningham ("Plaintiff," for purposes of the Georgia Class' claims) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

417.   Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

418.   Ford was aware of the Tailgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

419.   Having been aware of the Tailgate Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Tailgate Defect, Ford had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

420.   Ford did not disclose the Tailgate Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

421.   For the reasons set forth above, the Tailgate Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

422.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.

423.   Had Plaintiff and the other members of the Class known of the Tailgate Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

424.   Through its omissions regarding the Tailgate Defect within the Class Vehicles, Ford intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

425.   As a direct and proximate result of Ford's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Tailgate Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 16**
**UNJUST ENRICHMENT**
(Individually and on behalf of the Georgia Class)

426.   Plaintiff Cunningham ("Plaintiff," for purposes of the Georgia Class's claims) incorporates by reference each allegation in paragraphs 1-266 as if fully set forth herein.

427.   Plaintiff brings this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

428.   Ford has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Ford's concealment of the

Tailgate Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

429.   Ford has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

430.   It is inequitable and unconscionable for Ford to retain these benefits.

431.   Because Ford concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Ford's misconduct.

432.   Ford knowingly accepted the unjust benefits of its wrongful conduct.

433.   As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests relief against Ford as set forth below:

A.     Certifying the proposed Nationwide and Statewide Classes;

B.     Appointing Plaintiff as Class representative and the undersigned counsel as Class counsel;

C.   Ordering Ford to pay actual and statutory damages (including punitive damages) and restitution to Plaintiff and the other Class members, as allowable by law;

D.   Ordering all necessary and proper equitable relief against Ford, including enjoining Ford from continuing the unfair business practices alleged in this Complaint and ordering disgorgement of all profits obtained by Ford;

E.   Ordering Ford to pay both pre- and post-judgement interest on any amounts awarded;

F.   Ordering Ford to pay attorneys' fees and costs of suit; and

G.   Granting such additional relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 7, 2021

By: /s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
THE MILLER LAW FIRM PC
950 West University Drive
Rochester, Michigan 48307
(248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
Demet Basar (to be admitted)
J. Mitch Williams

130

Lydia Reynolds (to be admitted)
BEASLEY, ALLEN, CROW, METHVIN,
  PORTIS & MILES, P.C.
272 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
dee.miles@beasleyallen.com
clay.barnett@beasleyallen.com
demet.basar@beasleyallen.com
mitch.williams@beasleyallen.com
lydia.reynolds@beasleyallen.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

***Counsel for Plaintiff and the Class***

131

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on April 7, 2021, I filed the foregoing document using the electronic filing system which will serve all parties of record.

By: /s/ *E. Powell Miller*
E. Powell Miller (P39487)
THE MILLER LAW FIRM PC
950 West University Drive,
Rochester, Michigan 48307
(248) 841-2200
epm@millerlawpc.com