UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM CUNNINGHAM, *et al.*,

      Plaintiffs,                          Case No. 21-cv-10781
                                                 Hon. Matthew F. Leitman

v.

FORD MOTOR COMPANY,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF No. 30)

In this putative class action, Plaintiffs William Cunningham and Joe Moestretti bring claims against Defendant Ford Motor Company based upon an alleged defect in the tailgate latch release switch of their Ford pickup trucks.[1] (*See* Am. Compl., ECF No. 27.)  Ford has now moved to dismiss all of Cunningham's and Moestretti's claims. (*See* Mot. to Dismiss, ECF No. 30.)  For the reasons explained below, Ford's motion is **GRANTED IN PART AND DENIED IN PART**.

---

[1] There are two additional named Plaintiffs in this action: Tri-State Collision, LLC and Joel Weiss.  On November 24, 2022, Ford filed a motion to compel Tri-State and Weiss to arbitrate their claims. (*See* Mot. to Compel Arbitration, ECF No. 29.) On July 19, 2022, the Court granted that motion and stayed Tri State's and Weiss' claims. (*See* Order, ECF No. 53.)  Because the claims brought by Tri-State and Weiss are stayed, the Court will address in this order only the claims brought by Cunningham and Moestretti.

# I

Ford is one of the world's leading automakers. Plaintiffs are consumers who "purchased or leased one or more model year 2017-2021 Ford F-250, F-350, and F-450 Super Duty vehicles equipped with an electronic tailgate latch release switch" (the "Class Vehicles"). (Am. Compl. at ¶1, ECF No. 27, PageID.621.) According to Plaintiffs, their vehicles suffer from a defect that causes their "tailgates [to] unintentionally open, including while [their] vehicle[s are] in motion" (the "Tailgate Defect"). (*Id.* at ¶3, PageID.622.) Plaintiffs say that the "Tailgate Defect presents a serious risk of harm to occupants and others sharing the road. First, the Tailgate Defect can result in loss of unrestrained cargo, increasing the risk of injury or crash. Second, the Tailgate Defect can cause the tailgate to release and contact towed trailers, damaging both the tailgate and trailer. [Finally], the Tailgate Defect can reduce the clearance between [a Class vehicle] and a towed trailer, limiting the vehicle's range of mobility and increasing the risk of injury or crash." (*Id.* at ¶6, PageID.622.)

Plaintiffs further claim that even though Ford "kn[ew] that the Class Vehicles contained a dangerously defective and unreliable tailgate latch system," Ford nonetheless "continued to sell Class Vehicles and market them as safe, dependable, and capable of carrying, towing, and hauling heavy cargo and equipment." (*Id.* at ¶23, PageID.627.) And Plaintiffs say that they "were harmed" by Ford's failure to

alert them of the Tailgate Defect because the defect "renders the Class Vehicles less safe and less valuable than consumers would reasonably expect, and less safe and less valuable than the Class Vehicles would be if Ford did not design, manufacture and sell or lease the Class Vehicles with the Tailgate Defect." (*Id.* at ¶24, PageID.627.)   Finally, Plaintiffs insist that if Ford had "disclosed the Tailgate Defect, Plaintiffs and other [c]lass members would not have purchased or leased their vehicles or would have paid less for them." (*Id.* at ¶91, PageID.642-643.)

## II

Plaintiffs filed their First Amended Class Action Complaint, the operative pleading in this action, on September 27, 2021.  Plaintiff Cunningham is a Georgia resident who "purchased a new 2019 Ford F-250 from Fitzgerald Ford in Fitzgerald, Georgia on November 6, 2019." (*Id.* at ¶¶ 47-48, PageID.633.)  Plaintiff Moestretti is a North Carolina resident who "purchased a used 2018 F-350 from David McDavid Ford in Fort Worth, Texas in June 2019." (*Id.* at ¶¶ 55-56, PageID.635.)

Cunningham and Moestretti bring claims against Ford for fraud, breach of express and implied warranties under state law and under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (the "MMWA"), unjust enrichment, and violations of the consumer protection laws of Georgia and Texas.  They also seek to represent a class of nationwide plaintiffs and individual state-specific sub-classes.

3

Ford first moved to dismiss Cunningham's and Moestretti's claims on June 15, 2021. (*See* First Mot. to Dismiss, ECF No. 13.) Rather than respond to that motion, Cunningham and Moestretti filed an Amended Complaint that sought to remedy the alleged pleading deficiencies that Ford identified. (*See* Am. Compl., ECF No. 27.) On November 24, 2021, Ford moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Mot. to Dismiss, ECF No. 30.) The Court held an in-person hearing on the motion on June 15, 2022.

## III

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id*. When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). Mere "conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of

4

the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV

Ford moves to dismiss Cunningham's and Moestretti's claims on several grounds. The Court will address each of Ford's bases for dismissal separately in the order that Ford presented them in its briefing.

## A

Ford first argues that the Court should dismiss all of Cunningham's and Moestretti's claims brought under Michigan law. (*See* Mot. to Dismiss, ECF No. 30, PageID.1102, citing Counts 2-6 of the Amended Complaint.) Ford contends that Michigan law does not apply here. Ford's argument, in its entirety, consists of the following three sentences:

> No plaintiff is a Michigan resident, nor have they purchased, registered, or sought service for a vehicle in Michigan. As this Court has recognized, when there is no Michigan plaintiff or purchase, other states have a superior interest in having their laws applied to claims. *See McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 756 (E.D. Mich. 2019). The Court should dismiss the Michigan claims.

(*Id.*) The Court declines to dismiss Cunningham's and Moestretti's Michigan claims on this basis.

Ford has not conducted the required choice-of-law analysis. "To determine whether a rational reason exists to displace Michigan law, the Court conducts a two-step analysis." *McKee v. General Motors, LLC*, 376 F.Supp.3d 751, 756 (E.D. Mich. 2019). "First, the Court must determine whether a foreign state has an interest in having its law applied. Second, the Court must decide whether Michigan's interests in applying its law nevertheless mandate application of Michigan law." *Id.* Ford has not offered any analysis of either step. Instead, Ford relies entirely on the decision in *McKee* to apply Florida law instead of Michigan law to the parties' dispute over an automotive defect. But *McKee* is distinguishable. In *McKee*, "neither party dispute[d] that Florida law applie[d]." *Id.* Here, there is such a dispute. Thus, it was incumbent upon Ford to provide a careful choice-of-law analysis. Because Ford failed to provide the required analysis, the Court will not dismiss Cunningham's and Moestretti's Michigan-law claims at this time. Ford may re-raise (and properly support) its argument that Cunningham and Moestretti may not raise claims under Michigan law at a later stage of these proceedings.[2]

**B**

The Court next turns to Cunningham's and Moestretti's claims that arise out of Ford's alleged fraudulent omissions. (*See* Am. Compl., ECF No. 27, at Counts 2,

---

[2] Ford argues in the alternative that even if Cunningham and Moestretti may raise claims under Michigan law, the claims in the Amended Complaint under Michigan law fail on the merits. The Court addresses those arguments below.

6, 23, 25-26, 29, and 31.)  "For claims involving fraudulent omissions," like those at issue here, Federal Rule of Civil Procedure 9(b) "requires a plaintiff to plead the who, what, when, where, and how of the alleged omission." *McKee*, 376 F.Supp.3d at 760-61. "Specifically, a plaintiff pleading a fraudulent omission must allege (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Id.* at 761 (internal quotation marks omitted).  In the context of an allegedly defective product, "[a] complaint may suffice if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Id.*

## 1

Ford first argues that the Court should dismiss Cunningham's and Moestretti's fraud and misrepresentation claims because Cunningham and Moestretti "have not adequately pled knowledge of a defect." (Mot. to Dismiss, ECF No. 30, PageID.1104-1106.)  Ford says Cunningham and Moestretti have "offer[ed] only conclusory legal assertions that Ford was aware of [the] alleged defect because of pre-release design, engineering, manufacturing, and testing, as well as a supposed large number of claims for tailgate repairs." (*Id.*)   And Ford insists that

"[g]eneralized allegations about testing and analysis or warranty claims, without more, are insufficient to support an awareness of a defect." (*Id.*)   The Court declines to dismiss Cunningham's and Moestretti's fraud claims on this basis.

While Cunningham and Moestretti could have pleaded additional facts showing Ford's knowledge of the Tailgate Defect, their allegations, taken together, make out a plausible case that Ford was aware of the defect.  First, Cunningham and Moestretti allege that before they purchased their vehicles, Ford recognized the Tailgate Defect and attempted to address that defect.  More specifically, they contend that in October 2017, Ford issued a Technical Service Bulletin ("TSB") to its dealerships in which Ford (1) "acknowledg[ed] that some model year 2017 Class Vehicles 'may experience intermittent electrical concerns due to water intrusion into the 14405 wire harness," (2) specifically identified "uncommanded tailgate opening" as a "symptom" of the "electrical concerns," and (3) recommended that Ford's technicians "[r]eplace the 14405 wire harness." (Am. Compl. at ¶8, ECF No. 27, PageID.623. *See also* 10/16/2017 TSB, ECF No. 27-2.)

Second, Cunningham and Moestretti allege that a substantial number of consumers filed complaints with the National Highway Traffic Safety Administration ("NHTSA") identifying unexpected tailgate openings with F-250, F-350, and F-450 pickup trucks in the model years 2017-2020 (several of which were quoted in the First Amended Complaint). (*See* Am. Compl. at ¶¶ 119-159, ECF No.

27, PageID.651-671.)  And they say that Ford was aware of these complaints due to Ford's legal obligation under the TREAD Act, 49 U.S.C. § 30118, to "monitor[] consumer complaints submitted to NHSTA." (*Id.* at ¶118, PageID.650.)

Third, Cunningham and Moestretti contend that "[o]n October 12, 2018, [NHTSA] opened […] a pre-recall evaluation[] to investigate allegations of unintended tailgate openings in 2017 Ford F-250, F-350, and F-450 vehicles." (*Id.* at ¶9, PageID.623.)  NHTSA opened that investigation because it "ha[d] received complaints […] alleging the tailgate [in certain Class Vehicles] open[ed] uncommanded while [the] vehicle[s were] in motion." (NHTSA Office of Defects Investigation Summary, ECF No. 27-3, PageID.793.)  The evaluation was "opened to further assess the scope, frequency and safety consequences of the alleged defect." (*Id.*)  Ford then learned about the investigation and cooperated with it by, among other things, providing "data" to NHTSA that NHSTA concluded "showed high failure rates in the subject vehicles when compared to peer vehicles." (NHTSA Office of Defects Investigation Summary, ECF No. 27-6, PageID.802.)

Finally, Cunningham and Moestretti plead that around the time they purchased their vehicles, Ford issued a recall of Class Vehicles due to the Tailgate Defect.  (*See* Am. Compl. at ¶10, ECF No. 27, PageID.623-624.)  The recall notice was based on the Tailgate Defect: "For vehicles with an electric tailgate latch release switch mounted in the tailgate handle, water entering the electrical wiring system

may cause a short circuit resulting in the unintended switch activation and release of the tailgate latches. This could cause unintended opening of the tailgate either when the vehicle is not moving or is in motion." (Recall, ECF No. 27-4, PageID.795.)

The above-described allegations, when considered collectively, plausibly allege Ford's pre-sale knowledge of the Tailgate Defect.

Ford counters that most of Cunningham's and Moestretti's knowledge-based allegations are unrelated to the Class Vehicles. For example, Ford says that while Cunningham and Moestretti purchased 2019 and 2018 model year trucks respectively, the 2017 TSB "referred only to 2017 model-year vehicles." (Mot. to Dismiss, ECF No. 30, PageID.1104.) And Ford says that that the consumer complaints submitted to NHTSA quoted in the Amended Complaint "refer to vehicles other than those Plaintiffs own" and were mostly lodged after Cunningham and Moestretti purchased their trucks. (*Id.*, PageID.1105-1106.) Ford therefore insists that Cunningham's and Moestretti's "factual allegations do not plausibly support a conclusion that Ford knew of [the Tailgate Defect] at the time of [Cunningham's and Moestretti's] purchases." (*Id.*, PageID.1106.)

But Cunningham and Moestretti plausibly allege that that the same defect that was identified in the 2017 TSB carried through and existed in several different makes and model years, including the 2018 and 2019 model year vehicles they purchased. Indeed, Cunningham and Moestretti specifically allege that "the electronic tailgate

latch release switch (and the Tailgate Defect) in the 2017 Class Vehicles is the same as those in the 2018-2019 Class Vehicles. Additionally, this same electronic tailgate latch release switch (and Tailgate Defect) exists in 2020-2021 Class Vehicles." (Am. Compl. at ¶116, ECF No. 27, PageID.650.) Thus, even if the 2017 TSB, the 2018 NHTSA evaluation, and most of the consumer complaints identified in the Amended Complaint were not about the particular makes and model years purchased by Cunningham and Moestretti and/or were made after Cunningham and Moestretti purchased their trucks, Cunningham and Moestretti plausibly allege that all of the Class Vehicles (including their vehicles) are afflicted with the same defect. And, as this Court has previously concluded, where an automaker has knowledge of a defect in a "prior similar design" of a particular part, that "accretion of knowledge" can be used to show that the automaker had pre-sale knowledge of the same defect in the at-issue part. *Francis v. General Motors*, 504 F.Supp.3d 659, 685 (E.D. Mich. 2020). *See also MacDonald v. Ford Motor Co.*, 37 F.Supp.3d 1087, 1093 (N.D. Cal. 2014) ("Although the first TSB [identified by the plaintiffs] related only to the 2005 Ford Escape Hybrids, it is plausible that Ford knew of the defect in other model years because Plaintiffs allege the allegedly defective part in their vehicles is the same"); *Milisitis v. FCA US LLC*, 2021 WL 3145704, at *9 (E.D. Mich. July 26, 2021) (same).

Ford also argues that its 2019 recall is not relevant to the claims by Cunningham and Moestretti because they "bought before the recall." (Mot. to Dismiss, ECF No. 30, PageID.1105.)    Stated another way, Ford contends that because the recall was issued after Cunningham and Moestretti bought their vehicles, the recall cannot possibly show that Ford was aware of the Tailgate Defect at the time of their purchases.  The Court disagrees.  Recalls do not occur the instant that an automaker learns of a defect; instead, as Cunningham and Moestretti reasonably argue, recalls occur after a period of investigation, analysis, and deliberation.  Thus, the allegation by Cunningham and Moestretti that Ford initiated a recall in December 2019 supports a plausible inference that Ford was aware of the Tailgate Defect for some not-insubstantial period of time before that date.  Cunningham and Moestretti both purchased their vehicles within months of the recall.  The proximity between their purchases and the recall lends support to the inference that Ford was aware of the Tailgate Defect at the time of their purchases.  Indeed, Ford's counsel candidly acknowledged at the hearing on the motion to dismiss that where a customer purchases a car shortly before recall, the customer has a "stronger" argument that pre-sale knowledge existed. (*See* 6/15/2022 Hr'g Tr., ECF No. 50, PageID.1757 ("conced[ing]" that because Cunningham purchased his truck in "November of

2019," shortly before the December 2019 recall, "the argument [for the existence of pre-sale knowledge] is stronger there").)[3]

## 2

Second, Ford argues that Cunningham's and Moestretti's fraud-based claims fail because Cunningham and Moestretti "have not adequately pled reliance." (Mot. to Dismiss, ECF No. 30, PageID.1107.)  In particular, Ford says that Cunningham and Moestretti "only generally refer to advertising materials," do not "identify which materials – if any – each [Plaintiff] saw and relied on," and "fail to identify any statements about the tailgate on which they relied." (*Id.*)  The Court declines to dismiss the fraud-based claims on this basis.

As described above, Cunningham's and Moestretti's fraud claims are based primarily on Ford's omissions and its failure to identify the Tailgate Defect.  In a similar automotive defect case, *In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F.Supp.3d 618 (E.D. Mich. 2019), a defendant automaker argued that the plaintiffs could not maintain a fraud claim based on allegedly-deceptive advertisements because the plaintiffs had not "plausibly

---

[3] The Court agrees with Ford's counsel that the recall may provide stronger evidence of pre-sale knowledge for Cunningham than for Moestretti because Cunningham purchased his vehicle closer in time to the recall than Moestretti did.  However, the Court cannot conclude that Moestretti's purchase was so far removed from the recall that the recall is irrelevant to Moestretti's claim.

allege[d] that they relied on the[] advertisements." *Id.* at 640.  The Court rejected that argument as follows:

> In Plaintiffs' briefing and at the hearing on GM's motion to dismiss, Plaintiffs made clear that their fraud claims are not based on affirmative misrepresentations made in GM's advertisements.  Instead, Plaintiffs explain that their fraud claims are premised on "GM's failure to *disclose* the AC Defect." (Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1934; emphasis in original.)  And Plaintiffs' failure-to-disclose allegations are much like those found sufficient to state a viable fraud claim in *Beck, supra*.
>
> In *Beck,* the plaintiff alleged that the defendant automaker had "fail[ed] to disclose [a] defective rotary shifter system" in his vehicle. *See Beck*, 273 F. Supp. 3d at 750. The automaker moved to dismiss the fraud claim on multiple grounds, including that the plaintiff had failed to plead the elements of fraud with particularity. *See id.* at 751.  The court rejected that argument.  It first noted that, "[w]hen it comes to … fraud by omission or fraudulent concealment, a plaintiff faces a slightly more relaxed pleading burden; the claim can succeed without the same level of specificity required by a normal fraud claim." *Id.* (internal quotation marks omitted).   The court then concluded that the plaintiff had met his pleading burden:
>
>> Beck has adequately pleaded the "who" (FCA), the "what" (knowing about, yet failing to disclose, the alleged rotary shifter system defect), the "when" (from the time the vehicles were first placed on the market in 2012 to the present day), the "where" (the various channels through which FCA sold the class vehicles, including the dealership in Carlsbad, California, where Beck purchased his vehicle), and the "how" (if Beck and the class members had known of the alleged defect, they would have not purchased or leased the class vehicles, or they

would have paid less for them). Thus, Beck has satisfied the pleading requirements for Rule 9(b).

*Id.* at 751-52.

Likewise here, Plaintiffs plausibly allege the "who" (GM), the "what" (knowing about, yet failing to disclose, the alleged air conditioning system defect), the "when" (from the time the vehicles were first placed on the market to the present day), the "where" (various advertisements, window stickers on Class Vehicles, and discussions with GM dealers who did not disclose the defect), and the "how" (if Plaintiffs had known of the alleged defect, they would not have purchased or leased the Class Vehicles, or they would have paid less for them). Thus, like the plaintiff in *Beck*, Plaintiffs satisfied their pleading burden, including the burden to plead reliance. *See also Bryde v. Gen. Motors, LLC*, 2016 WL 6804584, at *12 (N.D. Cal. Nov. 17, 2016) (rejecting argument that "plaintiffs fail[ed] to sufficiently plead a fraudulent omission claim because plaintiffs [did] not allege that they viewed and relied on specific GM advertising" and holding that plaintiffs had satisfied burden to plead reliance where plaintiffs "alleged that they interacted with a GM dealer sales representative" and the sales representative did not disclose alleged defect).

Finally, the United States District Court for the Northern District of California's recent decision in *In re General Motors LLC CP4 Fuel Pump Litigation*, *supra*, further confirms that Plaintiffs' allegations are sufficient even though they did not identify specific advertisements. In that case, GM moved to dismiss the plaintiffs' fraud claims on the basis that the plaintiffs had failed to plead fraud with the required particularity in part because they did not identify the specific advertisements on which they allegedly relied. The Court disagreed. It held that where a plaintiff alleges fraudulent omissions, as opposed to affirmative misrepresentations, "the relevant questions [] are whether [p]laintiffs have adequately alleged (1) that

> GM had knowledge of the defect, and (2) that defect was material." *Id.* at *4. Here, for all of the reasons explained above, Plaintiffs plausibly allege that GM "had knowledge" of the AC Defect and the AC Defect "was material." *Id.* Plaintiffs therefore satisfy the pleading requirements of their fraud claims.

*Id.* at 640-41. For all of the same reasons, Cunningham and Moestretti have satisfied the pleading requirements for their fraudulent-omission claims here. They plausibly allege the "who" (Ford), the "what" (knowing about, yet failing to disclose, the Tailgate Defect), the "when" (from the time the vehicles were first placed on the market to the present day), the "where" (various Ford advertisements, promotional materials, Ford's website, window stickers, and discussions with Ford sales representatives), and the "how" (if Ford had disclosed the Tailgate Defect, Cunningham and Moestretti would not have purchased or leased their trucks or they would have paid less for them). The Court therefore declines to dismiss Cunningham's and Moestretti's fraud claims based on a failure to adequately plead reliance.

## C

Ford next argues that the Court should dismiss Cunningham's and Moestretti's express warranty claims. (*See* Mot. to Dismiss, ECF No. 30, PageID.1108-1110, citing Am. Compl. at Counts 3, 8, 21, and 27.) Ford argues, among other things, that Cunningham and Moestretti cannot maintain a breach of express warranty claim because neither complied with the terms of that warranty.

16

(*See id.*, PageID.1109-1110.)   More specifically, Ford says that (1) Cunningham never "presented [his] vehicle for repair" as the express warranty required and (2) Moestretti has not pleaded that his truck was "under warranty" when he brought it in for repairs (*i.e.*, "that [Moestretti presented the vehicle [for repairs] within three years of the warranty activation or when the vehicle had 36,000 or fewer miles, which are essential elements of his [express warranty] claim"). (*Id.*)   The Court agrees.

The express warranty at issue here "covers the Class Vehicles for three years or 36,000 miles, whichever comes first." (Am. Compl. at ¶243, ECF No. 27, PageID.713.)  The express warranty further provides "that Ford will 'without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship' so long as the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period." (*Id.* at ¶244, PageID.713.)

The facts pleaded here do not plausibly establish that either Cunningham or Moestretti complied with the express warranty's requirement to take their vehicle "to a Ford dealership for repair within the warranty period."  Cunningham does not plead that he ever took his truck in for a repair.  And while Moestretti says that he "first experienced the symptoms associated with the Tailgate Defect soon after

17

purchase of his Class Vehicle at approximately 21,000 miles" and that he, at some unspecified time later, "reported the Tailgate Defect to a Ford dealership in North Carolina who performed [unsuccessful] repairs on the Class Vehicle's Tailgate System" (Am. Compl. at ¶59, ECF No. 27, PageID.636), he does not plead facts that could establish that his truck was under warranty at the time he presented it for repair.  As explained above, Ford's express warranty requires a customer to bring his vehicle in for repair within 3 years or 36,000 miles, whichever comes first. Moestretti purchased his truck used, and he does not say when it was first purchased. (*See id.* at ¶56, PageID.635.)  Nor does he specifically identify when he brought it in for repair.  Thus, Moestretti does not plead facts that could plausibly establish that he sought repairs within the three-year warranty period.  Moreover, while Moestretti alleges that the Tailgate Defect manifested at 21,000 miles, he does not say how many miles his car had been driven at the time he actually brought it in for repairs. Moestretti therefore has not pleaded sufficient facts to support his express warranty claim.    For all of these reasons, Cunningham's and Moestretti's express warranty claims must be dismissed. *See*, *e.g.*, *Wozniak v. Ford Motor Co.*, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019) (dismissing express warranty claims and holding that "Plaintiffs [had] failed to adequately plead a breach because they ha[d] not pleaded that [any] named Plaintiff presented their vehicles to a Ford dealership before the

earlier of three years or 36,000 miles occurred"); *Roe v. Ford Motor Co.*, 2019 WL 3564589, at * 9 (E.D. Mich. Aug. 6, 2019) (same).

Cunningham and Moestretti counter that they did not need to bring their vehicles in for repair during the warranty period because Ford was "unwilling [and] unable to" repair the Tailgate Defect. (Resp. to Mot. to Dismiss, ECF No. 34, PageID.1246-1247.) Thus, they insist that any attempt to repair their trucks "would have been futile." (*Id.*) But "Ford must have at least been given an opportunity to repair or replace the defective [part]." *Gregorio v. Ford Motor Co.*, 522 F.Supp.3d 264, 289 (E.D. Mich. 2021). *See also In re MyFord Touch Consumer Litigation*, 46 F.Supp.3d 936, 970 (N.D. Cal. 2014) (explaining that "[t]o the extent Plaintiffs make the alternative argument that they are excused from bringing in their cars for repairs because to do so would have been futile, the Court is not persuaded," and noting that "[e]ven if half of Ford's cars had [an alleged defect], as alleged by Plaintiffs in their complaint, [...], that does not necessarily mean that Plaintiffs' problems could not be fixed"); *Arakelian v. Mercdez-Benz USA, LLC*, 2018 WL 6422649, at *4 (C.D. Cal. June 4, 2018) (dismissing express warranty claim and rejecting argument "that a warranty is breached when repair would be futile, even if repair attempts are not provided to a manufacturer"). Because neither Cunningham nor Moestretti plead facts that could plausibly establish they presented their vehicles for repair within the applicable warranty period, and because they have failed to persuade the Court that

they were excused from complying with the durational limits of the express warranty, the Court will dismiss their express warranty claims.[4]

## D

Next, Ford argues that the Court should dismiss Cunningham's and Moestretti's breach of implied warranty claims. (*See* Mot. to Dismiss, ECF No. 30, PageID.1110-1112, citing Am. Compl. at Counts 22, 28.)  The Court declines to dismiss Cunningham's breach of implied warranty claim (Count 22), but it will dismiss Moestretti's claim (Count 28).

## 1

Ford initially moved to dismiss Cunningham's breach of implied warranty claim on the basis that Cunningham failed to plead that he was in privity with Ford. (*See id.*, PageID.1110.)  But, in its reply brief, Ford "concede[d] that Georgia law," which applies to Cunningham's claims, "appears to hold that [] Cunningham would be in privity for implied warranty." (Ford Reply Br., ECF No. 42, PageID.1633 at n.5.)  Given that concession, the Court will deny Ford's motion to the extent that it seeks to dismiss Cunningham's breach of implied warranty claim.

---

[4] Because the Court concludes that Cunningham and Moestretti do not plausibly allege a breach of the applicable express warranties, it need not, and does not, address Ford's alternative bases for dismissing their express warranty claims.

**2**

Ford has, however, persuaded the Court that Moestretti's breach of implied warranty claim is not viable.  Ford argues that (1) its express warranty "limits implied warranties to the duration of the express warranty" (*i.e.*, 3 years or 36,000 miles, whichever occurs first) and (2) "Moestretti has not alleged sufficient facts to show that any alleged breach occurred within the [warranty] period." (Mot. to Dismiss, ECF No. 30, PageID.1111.)  Moestretti does not dispute that the implied warranty has the same durational limits as the express warranty.  Instead, he insists that "Ford's argument is meritless because [he] experienced symptoms of the Tailgate Defect at approximately 21,000 miles, and as a result, took his vehicle to the Ford dealership for repairs." (Resp. to Mot. to Dismiss, ECF No. 34, PageID.1251.)  But for all of the reasons explained above (in Section (IV)(C)), Moestretti does not plead facts that could establish that his truck was under warranty at the time the Tailgate Defect manifested and/or at the time he sought repairs.  Moestretti's breach of implied warranty claim therefore must be dismissed.

**E**

Ford next argues that the Court should dismiss Cunningham's and Moestretti's MMWA claims. (*See* Mot. to Dismiss, ECF No. 30, PageID.1111-1112, citing Am. Compl. at Count 1.)  "[T]he MMWA lacks substantive requirements" and instead "provides a federal remedy for breach of warranties under state law." *McKee*,

21

376 F.Supp.3d at 760. "Thus, the applicability of the MMWA is directly dependent upon a sustainable claim for breach of warranty." *Id.* (internal punctuation omitted). In other words, "if there exists no actionable warranty claim, there can be no violation of the [MMWA]." *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005). Ford insists that because Cunningham's and Moestretti's "state-law warranty claims" fail, their MMWA claim in Count 1 must also fail and be dismissed. But, as explained above, the Court has declined to dismiss Cunningham's breach of implied warranty claim. Thus, because at least one breach of warranty claim remains viable, the Court declines to dismiss Cunningham's MMWA claim at this time.

## F

Next, Ford argues that Cunningham's and Moestretti's unjust enrichment claims "fail because a contract governs the subject matter of th[is] dispute" (*i.e.*, Ford's express warranty). (Mot. to Dismiss, ECF No. 30, PageID.1112, citing Counts 5, 24, and 30.) The Court agrees. As the Court explained when rejecting similar unjust enrichment claims brought by a group of vehicle owners against the manufacturer of their vehicles, a vehicle purchaser cannot maintain an unjust enrichment claim where there is an express warranty that governs the same subject matter as his unjust enrichment claims:

22

Plaintiffs' unjust enrichment claim is not cognizable because there is an express contract that covers the same subject matter – namely, the express limited warranty that GM provided at the time the Class Vehicles were first purchased. "Courts will not imply a contract" for the purposes of an unjust enrichment claim "where there is an express contract governing the same subject matter." *GM Air Conditioning*, 406 F. Supp. 3d at 634 (emphasis removed) (dismissing unjust enrichment claim). *See also FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties"); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) ("Under [] California ... law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties."). Indeed, courts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims. *See, e.g., McKee*, 376 F. Supp. 3d at 762 ("Because the [w]arranty governs [p]laintiff's claims against GM for the Transmission Defect, a claim for unjust enrichment is unavailable to him."); *Mitchell v. Gen. Motors, LLC*, 2014 WL 1319519, at *15 (W.D. Ky. Mar. 31, 2014) (granting GM's motion to dismiss unjust enrichment claim where "the written [w]arranty is an explicit contract that governs their relationship"); *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *15 (E.D. Mich. June 7, 2018) (holding that plaintiffs' "unjust enrichment claims … fail because the terms of the GM Limited Warranty governs the parties' rights and obligations with respect to defects in materials and workmanship, and thus no contract will be implied in law to defeat the GM Limited Warranties' express terms"). Thus, because the express limited warranty governs the same subject matter as Plaintiffs' unjust enrichment claim,

that claim fails. *See GM Air Conditioning*, 406 F. Supp. 3d
at 635.

*Hall v. General Motors, LLC*, 2020 WL 1285636, at *10 (E.D. Mich. Mar. 18, 2020)

(internal footnote omitted). *See also In re General Motors Air Conditioning*

*Marketing and Sales Practices Litigation*, 406 F.Supp.3d at 634 ("Plaintiffs cannot

maintain their unjust enrichment claim here because there is an express contract

governing the same subject matter as that claim – the express Limited Warranty").

Cunningham and Moestretti counter – like the plaintiffs did in *Hall* – that

Federal Rule of Civil Procedure 8(a)(3) "permits pleadings in the alternative." (Resp.

to Mot. to Dismiss, ECF No. 34, PageID.1252.)  But here, there is no dispute that

the express warranty exists and that it governs the subject matter of which repairs

Ford has agreed to perform and under what circumstances Ford would conduct the

repairs.  Thus, as in *Hall*, because there is a contract that covers the same subject

matter as this dispute, Cunningham and Moestretti may not maintain an unjust

enrichment claim as an alternative to their breach of express warranty claims. *See*

*Gregorio*, 522 F.Supp.3d at 294 (dismissing unjust enrichment claims where express

warranty "governe[d] the parties' relationship and [defendant's] duties to remedy

defects" and where "[t]he dispute [was] over what types of defect [the defendant

was] required to repair or replace under the warranty").  The Court will therefore

dismiss Cunningham's and Moestretti's unjust enrichment claims.

24

# G

Ford next moves to dismiss Cunningham's and Moestretti's negligent misrepresentation claims based on the economic loss doctrine. (*See* Mot. to Dismiss, ECF No. 30, PageID.1115, citing Counts 6 and 31.) As the Court has previously explained, "[w]hether the economic loss doctrine bars Plaintiffs' fraudulent omission claims is an especially complex issue with seemingly persuasive authority on both sides and with potentially different applications of the doctrine under the laws of different states." *Milisits*, 2021 WL 3145704, at *10. And here, as in *Milisits*, "[g]iven the page limits imposed on the motion-to-dismiss briefing, neither party was fully able to develop their arguments concerning the applicability of the doctrine to [Cunningham's and Moestretti's] claims." *Id.* Thus, the Court concludes that due to "the complexity of the economic-loss-doctrine issues in this case, the soundest course of action is to defer decision on application of the doctrine until the summary judgment stage of these proceedings. At that time, if necessary, the Court will grant the parties additional page extensions in order to fully brief this issue on a state-by-state basis."[5] *Id.*

---

[5] As in *Milisits*, "[d]eferring a decision on [Ford's] economic-loss-doctrine arguments should not meaningfully change the scope of proceedings moving forward. For all of the reasons explained above, [Cunningham and Moestretti] will be allowed to proceed to discovery [on] their fraudulent omission claims. Thus, even if the Court agreed with [Ford] that the economic loss doctrine barred [Cunningham's and Moestretti's negligent misrepresentation claims], other fraudulent omission claims would remain, and discovery would proceed in much the

Ford also argues that Moestretti's negligent misrepresentation claim is barred by Texas' two-year statute of limitations. (*See* Mot. to Dismiss, ECF No. 30, PageID.1115.)   But the Court concludes it is too early to dismiss Moestretti's negligent misrepresentation claim on that basis.   Plaintiffs argue that under Texas law, "[t]he date of purchase does not start the statutory limitations period" and instead, the date "'facts come into existence that authorizes [a] party to seek a judicial remedy controls.'" (Resp. to Mot. to Dismiss, ECF No. 34, PageID.1258, quoting *Nemeth v. Republic Title of Texas, Inc.*, 2018 WL 3062393, at *3 (Tex. Ct. App. June 21, 2018).)   Ford did not respond to that argument in its reply brief. Because it is not yet clear when Moestretti knew or should have known about the Tailgate Defect, and because this argument has not been briefed by the parties in sufficient detail, the Court will defer ruling on Ford's statute-of-limitations defense until after the close of discovery.

## H

Finally, Ford argues that the Court should dismiss Cunningham's and Moestretti's claims under Georgia's Fair Business Practices Act (the "GFBPA"), the

---

same fashion regardless of how the Court ruled on the economic loss doctrine question.   Simply put, postponing a decision on [Ford's] economic-loss-doctrine arguments until full briefing at the summary judgment stage will not substantially enlarge or impact the scope of discovery or the course of proceedings, and that fact further convinces the Court to delay decision on the economic-loss-doctrine questions." *Milisits*, 2021 WL 3145704, at *10.

Georgia Uniform Deceptive Trade Practices Act (the "GUDTPA"), and the Texas Deceptive Trade Practices Act (the "TDTPA"). (*See* Mot. to Dismiss, ECF No. 30, PageID.1115-1118, citing Am. Compl. at Counts 19, 20, and 26.)  The Court will address each of Ford's arguments separately.

1

First, Ford argues that Cunningham's "GFBPA claims can[not] be asserted on behalf of a class." (*Id.*, PageID.1116, citing Count 19.)  The Court agrees.

The Court begins its analysis, as it must, with the text of the statute.  Here, the relevant provision of the GFBPA states that "[a]ny person who suffers injury or damages ... as a result of consumer acts or practices in violation of this part ... may bring an action individually, but not in a representative capacity...."  O.C.G. § 10-9-399.  But that does not end the Court's inquiry because Federal Rule of Civil Procedure 23 "unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met." *Fishon v. Mars Petcare US, Inc.*, 501 F.Supp.3d 555, 574 (M.D. Tenn. 2020) (emphasis in original).  Thus, "[t]he question is whether [the GFBPA bar on class actions] survive[s] Federal Rule of Civil Procedure 23." *In re Myford Touch Consumer Litigation*, 2016 WL 7734558, at *26 (N.D. Cal. Sept. 14, 2016).  This is a difficult question that has sharply divided the federal courts. *See*, *e.g.*, *Reynolds v. FCA US LLC*, 546 F.Supp.3d 635, 658 (E.D. Mich. 2021) (recognizing the "split in authority"

27

on this issue under the GFBPA); *Miller v. Ford Motor Co.*, --- F.Supp.3d ---, 2022 WL 3229503, at *19 (E.D. Cal. Aug. 10, 2022) (collecting cases and explaining that "[f]ederal district courts are divided on whether the prohibition of [G]FBPA class action claims applies in federal court").

This Court joins the other federal district courts that have answered that question "yes" and that have barred plaintiffs from pursuing class actions under the GFBPA.  As another Judge of this Court has explained when examining this question in the context of an automotive defect case:

> GM says Georgia and Tennessee "preclude class actions under their consumer protection statutes, and therefore the class action allegations under these laws fail as a matter of law."

> Plaintiffs do not contest that the GFBPA and Tennessee Consumer Protection Act ("TCPA") bar class actions. However, they say GM ignores settled law holding that class actions may continue even if a state consumer protection statute precludes them, so long as applying Fed. R. Civ. P. 23 does not abridge, enlarge or modify any substantive right. Plaintiffs cite the United States Supreme Court's plurality decision in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

> This Court, like "the majority of district and circuit courts" that have considered the issue, finds that Justice Stevens' concurrence is the controlling opinion in Shady Grove. *See Greene v. Gerber Prod. Co.*, 262 F.Supp.3d 38, 60 (E.D.N.Y. 2017) (collecting cases).

> Justice Stevens' approach "focus[es] on whether the state law had a substantive purpose and acknowledge[es] the possibility that [a] state rule[ ] that [is] otherwise

procedural 'may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy,' and...should not be preempted by a conflicting federal rule." *See Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL 5201079, at *8 (E.D.N.Y. Nov. 9, 2017) (quoting *Shady Grove*, 559 U.S. at 420, 130 S.Ct. 1431 (Stevens, J., concurring in part and concurring in the judgment)). "Under this view, Justice Stevens concluded that the determination of whether a state rule is supplanted by a federal rule depends not on 'whether the state law at issue takes the form of what is traditionally described as substantive or procedural' but rather on 'whether the state law actually is part of a State's framework of substantive rights or remedies.'" *Id*. (quoting *Shady Grove*, 559 U.S. at 419, 130 S.Ct. 1431 (emphasis in original)).

Applying this approach, this Court finds that the class action prohibitions set forth in the GFBPA and TCPA define the scope of the state-created rights and are therefore substantive and not displaced by Rule 23. See *Delgado*, 2017 WL 5201079, at *10 (finding that the class action bar in the Georgia and Tennessee consumer protection statutes demonstrates a "substantive policy choice ... to limit not only the form of the action but also the remedies available," such that they apply over Rule 23); *In re Target Corp. Data Sec. Breach Litig.*, 66 F.Supp.3d 1154, 1165 (D. Minn. 2014) (holding that "[p]laintiffs cannot maintain a class action as to the alleged consumer-protection statutory violations in [ ] Georgia ... and Tennessee" because their statutory prohibitions of class actions define the scope of the state-created rights and are therefore substantive in nature); *Bearden v. Honeywell Int'l Inc.*, 2010 WL 3239285, at *10 (M.D. Tenn. Aug. 16, 2010) ("[T]his court finds that the class-action limitation contained in the TCPA is so intertwined with that statute's rights and remedies that it functions to define the scope of the substantive rights.").

*Matanky v. General Motors LLC*, 370 F.Supp.3d 772, 798-99 (E.D. Mich. 2019).

The Court finds the analysis quoted above in *Matanky* persuasive and follows it here.   As in *Matanky*, because the GFBPA's prohibition on class claims is substantive in nature and therefore not displaced by Rule 23, Cunningham cannot maintain his class claim under the GFBPA.[6]   *See also Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL 5201079, at *7 (E.D.N.Y. Nov. 9, 2017) (dismissing class claim under the GFBPA).

**2**

Second, Ford argues that Cunningham's GFBPA claim fails because "the GBPA applies only in the 'unregulated consumer marketplace' – not in 'regulated areas of activity.'" (Mot. to Dismiss, ECF No. 30, PageID.1116-1117, citing Count 19.)   And Ford says that "[t]he extensive regulation of automotive sales and recalls exempt Ford from [Cunningham's] GFBPA claim." (*Id.*, PageID.1117.)

---

[6] The Court applied this same analytical framework in *Milisits*, *supra*.  In that case, the defendant automaker argued that the plaintiffs could not maintain a class action under the Virginia Consumer Protection Act (the "VCPA") because Virginia law contained a prohibition against consumer class actions.   In order to decide the question presented by the automaker's argument, the Court, following Justice Stevens' approach from *Shady Grove*, analyzed whether Virginia's ban on class actions was a substantive component of the VCPA or a procedural component of Virginia law more generally. *See Milisits*, 2021 WL 3145704, at *12.   The Court concluded that Virginia's bar on class actions did not control because the bar was not "a provision of the VCPA itself." *Id.* (quoting *In re Hardieplank Fiber Cement Siding Litigation*, 2013 WL 3717743, at *17 (D. Minn. July 15, 2013)).   Here, in contrast, the ban on class actions is found in the GFBPA itself.   It is therefore a substantive component of the rights conferred by the GFPBA, and it applies to GFBPA claims brought in federal court.

Ford has not yet persuaded the Court that Cunningham's GFBPA claim fails on this basis.  The only Georgia cases on which Ford relies relate to the regulation of mortgages, not automobiles.  Without additional briefing from Ford about how the GFBPA applies in the context the auto market and the regulation of automobiles, the Court is not yet prepared to dismiss Cunningham's GFBPA claim.

**3**

Third, Ford argues that Cunningham's GUDTPA claim must be dismissed. (*See* Mot. to Dismiss, ECF No. 30, PageID.1117, citing Count 20.)   The Court agrees.

The GUDTPA authorizes a court to grant injunctive relief prohibiting a party from engaging in deceptive trade practices.  As the United States District Court for the Northern District of Georgia has explained, "[u]nder [the] GUDTPA, '[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.'" *Amin v. Mercedes-Benz USA, LLC*, 301 F.Supp.3d 1277, 1292 (N.D. Ga. 2018) (quoting O.C.G. § 10-1-373(a).)   "An injunction under this provision requires the allegation (and presentation of evidence showing) of a likelihood of future harm by a deceptive trade practice." *Id.*  at 1293.  In other words, "[t]o have standing to seek injunctive relief under the [G]UDTPA, a plaintiff must show ... that []he is likely to be damaged in the future by some deceptive trade

31

practice of the defendant.  A plaintiff who demonstrates past harm, but does not allege ongoing or future harm, has not shown that he is likely to be damaged' within the meaning of section 10-1-373(a)." *Matanky*, 370 F.Supp.3d at 800 (internal citations and quotation marks omitted).

Cunningham's GUDTPA claim appears to have two components.  First, Cunningham alleges that "Ford engaged in deceptive acts or practices" actionable under the GUDTPA by omitting "material facts" about the Tailgate Defect from its advertisements and marketing campaigns. (Am. Compl. at ¶¶ 489-490, ECF No. 27, PageID.762.)  Cunningham claims that under the GUDTPA, he is entitled to relief based upon these omissions because, if Ford had disclosed the true extent of the Tailgate Defect, he would not have purchased his vehicle or would have paid less for it. (*Id.* at ¶492, PageID.763.)  Second, Cunningham seems to allege that he is "at risk of ongoing harm" from "future manifestations of the Tailgate Defect," and he insists that that "ongoing harm" also entitles him to injunctive relief under the GUDTPA. (*Id.* at ¶494, PageID.763.)  Neither component states a viable claim under the GUDTPA.

To begin, the first component of the claim – based upon alleged omissions from Ford's advertising and marketing campaigns – fails because Cunningham does not plausibly allege that those omissions are causing him (or may cause him) ongoing harm.  Simply put, Cunningham fails to plausibly allege that the omissions

will mislead him on a going-forward basis. He has "already bought a [vehicle], [is] now aware of the alleged defect, and do[es] not allege that [he is] likely to buy another [vehicle]," *Matanky*, 370 F.Supp.3d at 800-01, and there is thus no risk that he will rely upon the omissions in the future. Therefore, his allegations concerning the omissions "cannot sustain [a] GUDTPA claim." *Id. See also Amin*, 301 F.Supp.3d at 1294 ("Plaintiffs have not alleged that they will likely buy another class vehicle. They do not allege that putative class members are likely to again be misled by Mercedes' advertising. In short, Plaintiffs have plausibly alleged that they have been damaged, but they have not sufficiently alleged that they are 'likely to be damaged' again by Mercedes advertising and marketing.").

The second component of Cunningham's GUDTPA claim – based upon the ongoing harm that may result from the Tailgate Defect – fails because it focuses on the wrong kind of harm. As explained above, the GUDTPA allows a plaintiff to obtain an injunction against deceptive *trade practices*. However, continuing harm from the Tailgate Defect is not, itself, a deceptive trade practice against which the Court may issue an injunction under the GUDTPA. Thus, Cunningham may not rest his GUDTPA claim upon the alleged continuing harm from the Tailgate Defect. *See Amin*, 301 F.Supp.3d at 1294 (declining to grant injunctive relief under GUDTPA based upon claim of continuing harm from alleged product defect); *Matanky*, 370 F.Supp.3d at 801 (same).

33

For all of these reasons, the Court will dismiss Cunningham's GUDTPA claim.[7]

## 4

Finally, Ford argues that Moestretti's claim under the TDTPA is barred by that statute's two-year statute of limitations. (*See* Mot. to Dismiss, ECF No. 30, PageID.1118, citing Count 26.)  But as Ford acknowledges, that limitations period only begins to run once "the consumer became aware or reasonably should have been aware" of the alleged fraudulent business practice. (*Id.*)  And to determine when the limitations period began to run, there needs to be some discovery about Moestretti's knowledge of the Tailgate Defect and when he became aware, or should have become aware, of the defect.  Thus, the Court concludes that Ford's motion to dismiss this claim is premature and should be raised on summary judgment following discovery.

---

[7] In *In re General Motors*, *supra*, the Court declined to dismiss a plaintiff's GUDTPA claim. *See In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F.Supp.3d at 644-45.  But the argument presented to the Court in that case was different from the argument presented here.  In *In re General Motors*, the defendant made a limited argument: that because the plaintiff's vehicle had been successfully repaired, she did not identify *any* ongoing harm that could be remedied by an injunction.  The defendant did not argue, as Ford does here, that the injunctive relief available under the GUDTPA is limited to the prohibition of deceptive trade practices.  Thus, *In re General Motors* does not speak to the basis on which the Court is dismissing Cunningham's GUDTPA claim here.

## V

For all of the reasons explained above, Ford's motion to dismiss (ECF No. 30) is **GRANTED IN PART AND DENIED IN PART**.

The motion is **GRANTED** with respect to Cunningham's and Moestretti's express warranty claims (Counts 3, 8, 21, and 27), Moestretti's breach of implied warranty claim (Count 28), Moestretti's MMWA claim (Count 1), Cunningham's and Moestretti's unjust enrichment claims (Counts 5, 24, and 30), and Cunningham's GUDTPA claim (Count 20).   Those Counts of the Amended Complaint are **DISMISSED**.

The motion is **DENIED** in all other respects.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 17, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 17, 2022, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

35